UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WHEREVERTV, INC.,

     Plaintiff,

v.                              Case No:  2:18-cv-529-JLB-NPM

COMCAST CABLE
COMMUNICATIONS, LLC,

     Defendant.

_____

## **ORDER**

Pending before the Court are two motions filed by Defendant Comcast Cable Communications, LLC ("Comcast") challenging the admissibility of certain opinions offered by Plaintiff WhereverTV, Inc.'s ("WTV") technology and damages experts. (Doc. 222; Doc. 223.)  WTV has opposed both of Comcast's motions, and Comcast has replied.  (Doc. 238; Doc. 239; Doc. 254; Doc. 255.)  After careful review of the record and the relevant case law, the Court finds that both of Comcast's Motions in Limine are DENIED.

## **BACKGROUND**

WTV is a "television service provider that offers live-streaming video content" using a "wide range of internet enabled devices."  (Doc. 30 at ¶ 11.)  Comcast, which is one of the largest cable television and internet providers in the United States, sells an entertainment platform known as the Xfinity X1 Platform ("X1").  (Doc. 30

at ¶ 24.)  The X1 is "Comcast's premier cable service" and is alleged to "work[ ] the same way" as the claimed invention.  (Doc S-230-1 at ¶¶ 115, 309.)  In 2018, WTV filed suit in this Court, contending that Comcast has "directly infringed and continues to directly infringe <u>all</u> the limitations set forth in the '431 Patent's claims by making, using, offering for sale, and selling the Xfinity X1 Platform."  (Doc. 30 at ¶¶ 47–48.)

WTV introduced expert reports from Dr. William C. Easttom II ("Dr. Easttom") and Kyle Elam ("Mr. Elam").  Included in Dr. Easttom's report was a "Top Level Component Counting" analysis which identified the top level service components in the technical architecture of the X1 Platform and distinguished the infringing from non-infringing functions.  (Doc. at S-239-1 at ¶ 389).  Dr. Easttom identified seven top level service components without which the X1 would not operate effectively.  (<u>Id.</u> at ¶¶ 390–404.)  Among these components, he opined that five were infringing and two were non-infringing.  (<u>Id.</u> at ¶ 405.)  Dr. Easttom then assigned a weight to each of the top level service components reflecting the percentage of that component that corresponded to a claim in the '431 Patent.  (<u>Id.</u> at ¶ 405.)  The weights therefore represent the percentage of the particular top level component found to be infringing.  (<u>Id.</u> at ¶¶ 389, 405.)

Relying on Dr. Easttom's expert report, Mr. Elam calculated the reasonable running royalty he believed that Comcast and WTV would have agreed to at the time of a hypothetical royalties negotiation.  (Doc. S-260-1 at ¶¶ 135–38.) Averaging the weights assigned by Dr. Easttom to each of the seven top level

service components, Mr. Elam found that 30 percent of the X1's top level components were infringing.  (Id. at 160–61.)  Mr. Elam then applied the percentage of top level infringing components to the implied value of the X1 and found that, using this method of apportionment, Comcast and WTV would have agreed to a running royalty license agreement of $0.076 per X1 sold in the United States between September 2016 and July 2026.  (Id. at ¶¶ 137–38.)

Mr. Elam also conducted a second method of apportionment, separate from Dr. Easttom's component counting analysis, in which he started with the monthly fee charged by Comcast per X1 set top box, divided this fee by the average number of X1 set top boxes per subscriber, and then reduced the average fee per X1 set top box by the fee associated with the non-infringing features of the set top box[1] in order to isolate the implied value of the X1 set top box.  (Id. at ¶ 132.)  Mr. Elam determined that "approximately 20% . . . of Comcast's subscribers" would likely have used the infringing functionality at the time of the hypothetical royalties negotiation.  (Id. at ¶ 133.)  Multiplying this percentage by the implied value of the X1 set top box, less the amount that Comcast would have negotiated to maintain its

---

[1] Mr. Elam explains:

> "Comcast charges its customers $3.99 per month for a digital transport adapter ("DTA").  It is my understanding that a DTA is a small device that allows the digital cable network to display content on an analog TV but it is my understanding that the DTAs do not display the searchable interactive guide, premium channels, Video on Demand, or third party apps.  The monthly price differential of $5.96 between a STB and a DTA is probative of the value of the features only available on a STB."

(Doc. S-260-1 at ¶ 104.)

current device net cash flow margin, Mr. Elam calculated a running royalty of $0.05 per X1 set top box.  (Id.)

Comcast now moves to exclude the opinions of both Dr. Easttom and Mr. Elam under Federal Rule of Evidence 702, arguing that both experts' analyses present fundamental problems rendering them inadmissible.  (See Doc. 222; Doc. 223).  Because Mr. Elam's damages calculations are premised on the findings in Dr. Easttom's expert report, the two will be assessed in tandem, beginning with Dr. Easttom's technical report.

## LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

"Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence."  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587 (1993)).  This gatekeeping function aims "to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

In making Rule 702 determinations, district courts are afforded significant discretion. Kumho Tire, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.") Essentially, the Court is tasked with "ensuring that an expert's testimony . . . rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. Specifically, district courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Hacros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998).

The "burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). Where the expert testimony is found to be unreliable, it will be found inadmissible. Daubert, 509 U.S. at 595.

 Here, Comcast only challenges the second of the three factors outlined in City of Tuscaloosa: the reliability of the methodologies employed by Dr. Easttom and Mr. Elam in their component counting and apportionment analyses. (See Doc. S-228; Doc. S-229.) This factor "entails a preliminary assessment of whether the

reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93.  The reliability of an expert's methodology can be measured by, among other things, "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).  The expert's methodology "must be supported by appropriate validation—i.e., 'good grounds,' based on what it is known," and it is the Court's responsibility to determine whether those "good grounds" exist "in light of the particular facts and circumstances of the particular case." Daubert, 509 U.S. at 590 (quotation omitted); Kumho, 526 U.S. at 158.

Still, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Id.  Indeed, as the Eleventh Circuit has established, "[a] district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quotation omitted).  Instead, "shaky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596.  Ultimately, "where experts might reasonably differ," it is the factfinder that "must decide among the conflicting views of different experts." Kumho, 526 U.S. at 153.

## DISCUSSION

Both motions here relate to damages.  35 U.S.C. § 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  Under section 284, damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more."  Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014).  There are two categories of compensation for infringement: (1) the patentee's lost profits and (2) the "reasonable royalty he would have received through arms-length bargaining."  Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

Here, WTV only seeks reasonable royalty damages, which aim "to compensate the patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing."  AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1334 (Fed. Cir. 2014) (citation omitted).  There is "more than one reliable method for estimating reasonable royalty."  Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014).  A party can, for example, "use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or estimate the value of the benefit provided by the infringed features by . . . comparing the accused product to non-infringing alternatives," or something

else entirely.  Id.  In all events, though, "estimating a 'reasonable royalty' is not an exact science."  Id.

### A. Comcast's Motion to Exclude Certain Expert Opinions of Dr. William C. Easttom II is due to be denied.

Comcast argues that Dr. Easttom's component counting analysis is inadmissible because (1) the weights Dr. Easttom assigns to each component do not relate to the value that the '431 Patent contributes to the X1, and (2) the weights Dr. Easttom assigns are arbitrary and not derived from an identifiable formula or method.  (Doc. 222 at 5–6.)  For the reasons below, the Court finds that Comcast's criticisms are unwarranted and that Dr. Easttom's component counting analysis is admissible.  Accordingly, Comcast's motion to exclude certain opinions of Dr. Easttom (Doc. 222) is due to be denied.

### 1. The weights assigned by Dr. Easttom need not correspond to monetary value for his opinion to be admissible.

As a starting point, it is worth noting that the role of a technical expert is different than the role of a damages expert.  See Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-CV-03999-BLF, 2015 WL 4272870, at *3 (N.D. Cal. July 14, 2015) (assessing the opinions of technical experts regarding infringement separately from the opinions of damages experts regarding reasonable royalties, even where damages expert's opinion was based on technical expert's report).  While technical experts inspect the accused product and educate the factfinder as to the underlying technology, damages experts make financial calculations and opine on the proper methodology to calculate reasonable royalties or lost profits.  See Edward G.

Poplawski, Selection and Use of Experts in Patent Cases, 9 Fed. Cir. B.J. 145, 145–47. (1995). Technical experts often provide testimony on issues that relate directly to the elements of damages, but they do not typically opine on the monetary value of a particular component in an accused product. See Apple, 757 F.3d at 1321 ("[P]atent damages experts often rely on technical expertise outside of their field when . . . valuing the importance of the specific, infringing features in a complex device" because "[p]atent damages calculations are often intertwined with highly technical issues precisely because damages must be based on the scope of infringement, often an involved technical question.") Thus, a technical expert is not required to opine on the monetary value attributable to the patented invention for his opinion to be deemed reliable. See Intel Corp. v. Future Link Sys., LLC, No. CV 14-377-LPS, 2017 WL 2482881, at *4 (D. Del. June 1, 2017) (finding a technical expert's analysis admissible where the expert performed an element-by-element analysis solely considering infringement, not value).

Instead, in cases where the accused product is made up of multiple components, not all of which include infringing technology, a technical expert must perform some sort of apportionment, isolating the features of the accused product that correspond to the patent in suit. See Finjan, 879 F.3d at 1309–10; Mentor Graphics v. EVE–USA, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (Stoll, K. concurring) (order denying rehearing on banc) ("[W]here an infringing product is a multi-component product with patented and unpatented components, apportionment is required.") As the cases discussed below illustrate, one method of apportionment

9

involves identifying the total number of top level components in the accused device and determining a number, or weight, for each component based on the degree to which that component infringes upon the asserted patent.

In Finjan, for example, the plaintiff's technical expert prepared a report on the issue of infringement, and this report was relied upon by the plaintiff's damages expert in her reasonable royalties calculations. Finjan, 2015 WL 4272870, at *9. Specifically, the damages expert concluded that the technical expert's report "suggest[ed] a per-feature apportionment of sales revenue" and found that, of the twenty-four total features comprising the accused product, nine were infringing. Id. Based on this determination, the damages expert apportioned the accused product's revenue by dividing the number of infringing functions by the total number of functions and multiplying this fraction by the revenue. Id.

Similarly, in Guardant Health, Inc. v. Foundation Medicine, Inc., the trial court found that the plaintiff's technical expert's opinion was sufficiently reliable where the expert divided the accused method into sixteen steps and then determined which of those steps infringed upon the patent in question. No. CV 17-1616-LPS-CJB, 2020 WL 6742965, at *6 (D. Del. Nov. 17, 2020). The plaintiff's damages expert then relied on the technical expert's opinion to calculate the monetary value of the infringing steps in the accused method. Id. Both analyses survived the defendant's Daubert challenges because they were found to adequately "fit[] th[e] facts of th[e] case." Id.

10

Finally, in Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co. LP., the trial court found that the plaintiff's technical expert's component counting analysis was reliable.  218 F. Supp. 3d 375, 389 (E.D. Pa. 2016).  There, the technical expert "separated the overall process of each specific messaging call flow into steps based on infringing and non-infringing steps," and the plaintiff's damages expert used this report to "apportion[ ] the share of Comcast's SMS and MMS profitability that can be attributed to the alleged infringement of the [patent in suit]."  Id.  As the court held, there was an absence of caselaw supporting the "assertion that counting components or features is per se unreliable."  Id.

Here, Dr. Easttom's apportionment analysis is admissible because it clearly mirrors the methodologies employed by the technical experts in Finjan, Guardant, and Comcast.  Like those experts, Dr. Easttom identified the accused device's top level components, distinguished which components were infringing and non-infringing, and assigned a weight to each of these components based on the degree to which the component in question contributed to the infringement alleged.  (Doc. S-238-1 at ¶ 405.)  Specifically, Dr. Easttom ascertained that there are seven top level components in the X1 and found that the '431 Patent corresponds to, or drives, the functionality of 2.08 of these components.[2]  (Id.)  By segregating these

---

[2] Specifically, Dr. Easttom found that of the seven top level components, five had some subparts which were partially infringing.  Three had fifty percent infringing subparts, and so each of these was weighted at .5, one had twenty five percent infringing subparts and was weighted at .25, and one had thirty three percent infringing subparts and was weighted at .33.  Summing these infringing weights, as Mr. Elam ultimately did, yields .5 + .5 + .5 + .25 + .33 = 2.08. (Doc. S-239-1 at ¶ 405; Doc. S-260-1 at 160.)

components and weighting them by their infringing properties, Dr. Easttom, like the experts in <u>Finjan</u>, <u>Guardant</u>, and <u>Comcast</u>, facilitated an apportionment of the X1's monetary value by WTV's damages expert, Mr. Elam.  (<u>See</u> Doc. S-260-1 at 162.)  Thus, though Dr. Easttom's report does not measure the value of the '431 Patent with respect to the set top box, it need not do so because it is not presented as an economic analysis, like Mr. Elam's report.

As the case law makes clear, a technical expert need not measure the economic value of particular infringing components in order to contribute to a damages calculation.  Rather, the technical expert's report on infringement, which distinguishes the infringing components from the non-infringing components in the accused product, provides a proportion by which a damages expert can determine the economic value added by the infringing components to the accused product as a whole.  Accordingly, Dr. Easttom's component counting analysis is not unreliable merely because it does not assign monetary value to each of the components.  At bottom, Dr. Easttom is a technical expert, which makes Comcast's attempt to hold him to standards applicable only to damages expert misplaced.

### 2.  The weights assigned by Dr. Easttom are not arbitrary because they are derived from an identifiable formula.

Comcast's second challenge to Dr. Easttom's analysis is that the weights assigned by Dr. Easttom are arbitrary and not derived from an identifiable formula or method.  (Doc. 222 at 6.)  Specifically, Comcast asserts that Dr. Easttom's component counting analysis is inadmissible because "it fails to describe or apply

any principle that explains how his comparison of each component to the claim translates to a numeric apportionment value." (Id. at 15.)  This challenge also fails.

As the Federal Circuit has made clear, estimation does not render an apportionment unreliable or unreasonable.  See Aqua Shield v. Inter Pool Cover Team, 774 F.3d 766, 771 (Fed. Cir. 2014) (explaining that royalty calculations often involve "approximation and uncertainty"); Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1328 (Fed. Cir. 2014) (stating that "absolute precision" is not required in apportionment, as "it is well-understood that this process may involve some degree of approximation and uncertainty").  While an expert's methodology may not be a "black box into which data is fed at one end and from which an answer emerges at the other," such that "the jury cannot see how the pieces fit together or how the data drives the conclusion," "it is well-understood that this process of assigning value to a feature that may not have ever been individually sold may involve some degree of approximation and uncertainty."  Open Text S.A. v. Box, Inc., No. 13-CV-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015); Lawrence v. Raymond Corp., No. 09-CV-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011), aff'd, 501 Fed. Appx. 515 (6th Cir. 2012); Shopify Inc. v. Express Mobile, Inc., No. CV 19-439-RGA, 2021 WL 4288113, at *21 (D. Del. Sept. 21, 2021) (quotation omitted).  Thus, courts have found that where an expert "explains the facts underlying his apportionment percentages, how they connect to his apportionment percentages, and the methodology he used to arrive at his apportionment percentages" his apportionment rates are not "pulled out of thin air," and his report will be found reliable.  NetFuel,

13

<u>Inc. v. Cisco Sys. Inc.</u>, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *9 (N.D. Cal. Mar. 17, 2020).

Where the technical expert's analysis is clearly related to the facts of the case, relies on the defendant's technical documents, and adheres to a reliable apportionment methodology, trial courts have declined to exercise their discretion to exclude such expert opinions.[3] <u>See, e.g.</u>, <u>Shopify</u>, 2021 WL 4288113, at *21 (refusing to strike patentee's technical expert's apportionment opinion, on which the patentee's damages expert relied, because the technical expert provided "a specific analysis explaining why he assigned each particular percentage value," his opinion was "tied to the facts of the case," and thus his opinion was not "classic <i>ipse dixit</i>"); <u>Centripetal Networks, Inc. v. Cisco Sys., Inc.</u>, 492 F. Supp. 3d 495, 594–95 (E.D. Va. 2020) (refusing to strike patentee's technical expert's apportionment opinion testimony for unreliability because the expert (1) used the defendant's technical documents to identify the top level functions of each of the accused products; (2) "identified which of those top-level functions for each product are implicated by the

---

[3] The cases that Comcast cites to support the exclusion of an expert opinion purportedly failing "to describe and apply a principle for translating a qualitative methodology into a numeric value" are not on point. (Doc. 222 at 16.) Specifically, <u>LaserDynamics</u> deals with a damages expert's opinion, not a technical expert's opinion. 694 F.3d at 55. And in <u>NetFuel</u>, the court found inadmissible an expert's opinion offering only "vague, qualitative descriptions without some indication as to the weight or value attributed to each feature." 2020 WL 1274985, at *8. Here, Dr. Easttom assigned clear weight to each feature, so the flaws in the expert's report in <u>NetFuel</u> are not present here.

asserted patents and their asserted claims"; and (3) "highlighted all of the materials he relied upon in [his] analysis").

Instead, disputes about the methodology behind the technical analysis go to the weight of the apportionment, which can be explored further via cross-examination. See Osseo Imaging, LLC v. Planmeca USA Inc., No. CV 17-1386-LPS, 2020 WL 6318724, at *9 (D. Del. Oct. 28, 2020) (denying defendant's motion to strike plaintiff's technical expert's apportionment opinion because "Defendant will have the opportunity to cross-examine [the expert] at trial regarding methodology employed and [the jury] can evaluate how [Plaintiff's damages expert] incorporated the information from [Plaintiff's technical expert] in reaching his damages opinion"); Traxcell Techs., LLC v. AT&T Corp., No. 2:17-CV-00718-RWS-RSP, 2019 WL 4470618, at *3 (E.D. Tex. Sept. 18, 2019), aff'd sub nom. Traxcell Techs., LLC v. Sprint Commc'ns Co. LP, 15 F.4th 1121 (Fed. Cir. 2021) (denying motion to exclude technical expert's apportionment analysis where (1) the expert's methods of apportionment were reliable because other experts in the field would likely have relied upon the same materials that the expert did and (2) the challenges to the expert's opinion could be addressed on cross-examination); Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc., No. 6:11-CV-492-RWS-KNM, 2017 WL 4020591, at *7 (E.D. Tex. Sept. 13, 2017) (denying motion to exclude patentee's technical expert's testimony on apportionment—specifically, his opinion that "at least 50% of the benefit of [the accused product]'s functionality is attributable to the [patent in

suit]"—and finding that the accused infringer's challenge went to the weight of [the expert]'s apportionment rather than its admissibility").

Here, throughout the many pages of Dr. Easttom's expert report outlining his component counting analysis, Dr. Easttom explains his methodology in sufficient detail to render it reliable. Dr. Easttom's component counting analysis begins by identifying the seven top level components and then dividing each top level component into its various subparts or subfunctions to determine which of these various subparts or subfunctions are infringing. After determining which of the subparts or subfunctions of a particular top level component are infringing, Dr. Easttom then assigns a weight to the top level component reflecting the portion of that component comprised of infringing subparts or subfunctions.

For example, in Dr. Easttom's analysis of a top level component believed to infringe on Claim 1's limitation of a "server resident on a network containing descriptive program data about video content available from one or more MSOs and one or more non-MSOs," Dr. Easttom found that the component was twenty five percent infringing because its two core subparts infringed at fifty percent and zero percent, respectively.[4] (Doc. S-238-1 at ¶¶ 397–98.) Specifically, as Dr. Easttom explained, the first subpart of the component only met the "available from one or more MSOs" portion of the limitation, but not the "one or more non-MSOs" portion of the limitation, so it was only half infringing. (Id.) Meanwhile, the second

---

[4] Notably, Dr. Easttom's component counting analysis is not offered in a vacuum, but rather, at the end of a 258-page report opining, in detail, on the ways in which the X1 allegedly infringes the '431 Patent. (See Doc. S-239-1.)

subpart supported X1 features unrelated to the relevant limitation, so it was not infringing at all.  (Id.)  Given that half of one-half is one-quarter, Dr. Easttom's weight assigned to the entire top level component in question is not "plucked out of thin air" as Comcast suggests.  The same sort of analysis is applied to other top level infringing components.

For example, for a top level component with three subparts, only one of which is found to be infringing on Claim 1, Dr. Easttom assigned the entire component a weight of .33, representing the one-third of the components' subparts whose functionality corresponds to the '431 Patent.  (Id. at ¶ 404.)  And for two other top level components which perform some tasks that infringe and some tasks that do not infringe, Dr. Easttom opined that the components deserved a weight of .5, reflecting the 50 percent infringement.  (Id. at ¶¶ 391–95.)

This is a clear example of an apportionment methodology that has already been deemed sufficiently reliable by various other trial courts.  See Network-1 Techs., 2017 WL 4020591, at *7; Shopify, 2021 WL 4288113, at *21; Centripetal, 492 F. Supp. 3d at 594–95.  Given that Dr. Easttom's component counting technique is "generally accepted in the scientific community"—as evidenced by its employment by other technical experts—the Court finds that Dr. Easttom's analysis is reliable. Comcast's complaint that Dr. Easttom's weights are unrepresentative of "the contribution the X1's Platform's components make to the claims of the '431 Patent to the X1 Platform," is targeted at Dr. Easttom's conclusions, not the processes by which he arrived at them.  (Doc. S-228 at 13.)  Ultimately, such alleged flaws are "of

a character that impugn the accuracy of [Dr. Easttom's] results, not the general scientific validity of his methods." Quiet Tech., 326 F.3d at 1345. Thus, the proper mechanisms for challenging Dr. Easttom's opinions are cross-examination and presentation of contrary opinions and evidence. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Accordingly, Comcast's Motion to Exclude Certain Expert Opinions of Dr. William Easttom II is due to be denied.

### B. Comcast's Motion to Exclude the Opinions of Kyle P. Elam is due to be denied.

Comcast has also moved to exclude the opinions of WTV's damages expert, Mr. Elam, contending that Mr. Elam's methods are inadmissible because (1) he begins with an improper royalty base, (2) his apportionment methods target quantities other than the value of the claimed invention to that base, and (3) he applies his running royalties analysis years into the future so as to assign WTV damages for alleged infringement that has not occurred. The Court finds that, for the reasons below, Mr. Elam's expert damages opinion is admissible and accordingly, Comcast's Motion to Exclude the Opinions of Mr. Kyle P. Elam is due to be denied.

As the Federal Circuit has repeatedly held, "the essential requirement for reliability" for a damages expert's opinion evaluated under Daubert "is that the ultimate reasonable royalty award must be based on the incremental value that the

patented invention adds to the end product." Commonwealth Sci. & Indus. Research Org. v. Cisco Sys. Inc., 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quotation omitted). "As a substantive matter, it is the value of what was taken that measures a reasonable royalty under 35 U.S.C. § 284." Ericsson, 773 F.3d at 1226 (quotation omitted). This amounts to "only the value of the infringing features of an accused product." Id.

Where the accused device contains multiple components, some of which are alleged to be infringing and some of which are not, the patentee must give evidence apportioning its "damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." Finjan, 879 F.3d at 1310 (quotation omitted). A patentee's "damages expert must provide a specific economic analysis to support an opinion that reasonable royalties should be apportioned to reflect nonpatented characteristics of a multi-factor product." Sherwin-Williams Co. v. PPG Indus., Inc., No. CV 17-1023, 2020 WL 5077547, at *5 (W.D. Pa. Aug. 27, 2020). And the admissibility of an expert damages opinion hinges on the expert's ability to separate the value of the allegedly infringing features of the accused product from all of the accused product's other features. VirnetX, 767 F.3d at 1329. Critically, "[n]o matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." Id. at 1326.

1. **Mr. Elam's royalty base is proper because the entire market value rule is not applicable in this scenario.**

Comcast first argues that Mr. Elam's apportionment is inadmissible because it violates the entire market value rule ("EMVR"). According to the EMVR, "a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product" if it can prove that "the patented feature drives the demand for an entire multi-component product." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012). A patentee may also rely on the rule if it can show that the patented feature "was of such paramount importance that it substantially created the value of the component parts." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) (quotation omitted). Admitting evidence of the entire market value, "only serve[s] to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for the infringement." LaserDynamics, 694 F.3d at 67 (quotation omitted).

Still, the Federal Circuit has limited the EMVR's applicability such that the rule is often inappropriate for damages calculations. See Virnetx, 767 F.3d at 1326 ("[W]hen claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the value of the multi-component product."); SynQor, Inc. v. Artesyn Tech., Inc., 709 F.3d 1365, 1383 (Fed. Cir. 2013) ("A patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand and substantially creates the value of the component

20

parts." (emphasis added)); <u>Cornell Univ. v. Hewlett-Packard Co.</u>, 609 F. Supp. 2d 279, 285 (N.D. N.Y. 2009) ("The entire market value rule indeed permits damages on technology beyond the scope of the claimed invention, but <u>only</u> upon proof that damages on the unpatented components or technology is necessary to fully compensate for infringement of the patented invention." (emphasis added)). Essentially, to support use of the EMVR, a patentee must show that consumers would not buy the accused product at all without the patented feature.  <u>See</u> <u>Lucent Tech.</u>, 580 F.3d at 1337–38.  As the Federal Circuit explained in <u>LaserDynamics</u>:

> It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [accused product]. . . . [I]f given a choice between two otherwise equivalent [types of accused products], only one of which practices the [patented feature], proof that consumers would choose the [accused product] having the [patented feature] says nothing as to whether the presence of that functionality is what motivates consumers to buy an [accused product] in the first place.  It is this latter and higher degree of proof that must exist to support an entire market value theory.

694 F.3d at 68.

Here, Mr. Elam has neither opined that the '431 Patent's features were the sole driver of demand for the X1 devices, nor that WTV should receive damages based on the uninfringed portions of the X1 device.  (Doc. S-260-1 at ¶¶ 90–92, 130.) Instead, Mr. Elam has opined that at the time of the hypothetical royalties negotiation, "approximately 20% (33% times 62%) of Comcast subscribers were using" both MSOs and non-MSOs and "wanted a universal listing across sources." (<u>Id.</u> at ¶ 133.)  Thus, according to Mr. Elam, only one-fifth of all Comcast subscribers were seeking the functionality provided by the '431 Patent at the time

of the hypothetical royalties negotiation.  (Id.)  This is a far cry from stating, as the EMVR requires, that the presence of the '431 Patent's functionality in the X1 is what motivates consumers to buy a set top box in the first place.  The EMVR therefore does not apply to the royalties calculations at issue, as Mr. Elam has not suggested in any portion of his expert report that the X1's features corresponding to the '431 Patent are the basis for customer demand for the product writ large.

Noting that Mr. Elam has not evinced an intention to apply the EMVR to his calculations, the Court turns to the royalty base selected by Mr. Elam to determine whether it improperly implicates the EMVR.  The Court finds that it does not.  "The EMVR applies when an expert performs no apportionment, instead using the entire value of a product as the royalty base."  Rembrandt Social Media, LP v. Facebook, Inc., 22 F. Supp. 3d 585, 593 (E.D. Va. 2013); see also Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc., 761 F.2d 649, 656 (Fed. Cir. 1985) ("The district court applied the 'entire market value rule' and declined to apportion the damages between the value of the unpatented and patented features of the machines sold and rented.").  A damages expert's royalty base selection does not implicate the EMVR where the expert has apportioned the profits earned on the accused product between the patented and unpatented features because "the entire market value rule is an exception to the rule requiring apportionment."  Sloane Valve Co. v. Zurn Indus., Inc., 33 F. Supp. 3d 984, 911 (N.D. Ill. 2014).  Further, merely using the "full expected retail price" of the accused product as an "input" in a damages calculation "does not invoke the entire market value rule."  Biscotti Inc. v. Microsoft Corp., No.

22

2:13-CV-01015-JRG-RSP, 2017 WL 2536962, at *6 (E.D. Tex. May 18, 2017); SimpleAir, Inc. v. Google Inc., No. 2:14-CV-11, 2015 WL 5895401, at *3 (E.D. Tex. 2015) (explaining that an expert who "isolate[d] the value of [the] patented feature, separate[d] it from the value of the unpatented features, subtract[ed] any costs attributable to [the Defendant], and then use[d] the Georgia-Pacific factors to estimate how the Plaintiff and Defendants would split any such incremental profit at the hypothetical negotiation table" did not implicate the EMVR).

While Mr. Elam began his calculation of the royalty base with the X1 set top box's entire value, he then performed several separate apportionments winnowing down that base before arriving at the set top box's implied value. (Doc. S-260-1 at 160.) Mr. Elam started with the monthly fee charged by Comcast for the set top box and then reduced this value using data regarding the number of set top boxes per subscriber, the value of the non-patented features of the set top box, and as the share of customers that would likely use the patented features in the set top box.[5] (Id. at ¶ 132.) After this apportionment Mr. Elam arrived at a royalty base, which was just a fraction of the monthly fee amount with which he started. (Id. at 160.) This royalty base reflected only the implied value of the set top box, namely, the value of the set top box's features corresponding to the '431 Patent. (Id.) Mr.

---

[5] It is worth noting that Comcast's later challenge to Mr. Elam's second apportionment method appears to concede that Mr. Elam's royalty base is the narrowed, apportioned base, not the entire market value. (See Doc. S-229 at 19.) Specifically, Comcast states that Mr. Elam applies a certain percentage to his royalty base and cites to Mr. Elam's calculations applying that percentage to the implied value of the set top box, not the entire market value of the set top box. (Id. (citing Doc. S-260-1 at 162).)

Elam's royalty base therefore does not violate the EMVR merely because the starting point of his royalty base calculations was the fee charged per set top box—a proxy for the market value of the accused device.  Rather, because the royalty base proposed by Mr. Elam was just the implied value of the set top box, equal to roughly one-tenth of the entire market value of the set top box, Mr. Elam's royalty base selection is admissible.

### 2.  Mr. Elam's two methods of apportionment are admissible.

Next, Comcast argues that Mr. Elam's damages calculations also must be excluded because both of his methods fail to apportion the royalty base to reflect the incremental value of the patented technology.  (Doc. S-229 at 14.)  The Court disagrees and finds that both of Mr. Elam's methods of apportionment are admissible.

As outlined above in the context of Dr. Easttom's apportionment opinion, apportionment is not an "exact science."  Apple, 757 F.3d at 1315.  "[A]pportionment can be addressed in a variety of ways, including by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof."  Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (quotation omitted).

### a.  Method 1 apportions the invention's value.

Comcast argues that Mr. Elam's first method of apportionment is improper because merely estimating the percentage of Comcast subscribers who would have

used the '431 Patent's features at the time of the hypothetical royalties negotiation fails to reflect the value of the accused technology.  (Doc. S-229 at 15.)  WTV responds that Mr. Elam "took several other steps to isolate the value of patented features, and both precedent and economic logic support that evidence regarding use of patented features relates to value."  (Doc. 239 at 21.)  The Court finds that this disagreement goes to the weight of the evidence and Mr. Elam's calculation of a reasonable royalty via "Method No. 1" are thus admissible.

In <u>GREE, Inc. v. Supercell Oy</u>, for example, the patentee's expert determined a reasonable royalty rate by multiplying the likelihood of being a paying user with the percentage of users viewing a feature as important.  No. 2:19-CV-00070-JRG-RSP, 2020 WL 4057640, at *5 (E.D. Tex. July 20, 2020).  The defendant argued that neither factor had "any tie to the value of the patented feature."  <u>Id.</u>  The court found that this criticism went to the weight of the evidence, specifically because the expert "provided a basis for arriving at these numbers" and his "analysis was based on uncontested data specific to each case."  <u>Id.</u>

And in <u>Via Vadis, LLC v. Blizzard Ent., Inc.</u>, the patentee's expert performed a similar calculation, "multipl[ying] a royalty base calculated from estimates of the forecasted cumulative number of users of the Accused Products from the perspective of the 2006 hypothetical negotiation by a royalty rate calculated from the market value of a benchmark product."  No. 1:14-CV-00810-LY, 2021 WL 5908599, at *2 (W.D. Tex. Dec. 14, 2021) (internal quotation marks and brackets omitted).  There, the court held that the patentee's expert's estimates regarding the customers usage

of the accused product were "a question of fact that will go to the weight to be accorded to [the expert]'s opinions, not to the correctness of his methodology or the admissibility of his opinions under <u>Daubert</u>." <u>Id.</u> at *3.

Here, Mr. Elam used data obtained from Comcast to determine that about twenty percent of Comcast subscribers used non-MSOs and wanted features that would allow them to search or access content provided by MSOs and non-MSOs. (Doc. S-260-1 at 160.)  Like the experts in <u>GREE</u> and <u>Via Vadis</u>, Mr. Elam applied this information regarding user preferences to calculate a royalty by multiplying that percentage by the implied value of the accused product.  (<u>Id.</u>)  Thus, Mr. Elam's analysis is reliable.  As the courts held in both <u>GREE</u> and <u>Via Vadis</u>, whether or not the reasonable royalty arrived at via a damages expert's apportionment calculations accurately reflects the value of the patented features is a question better reserved for a fact finder.  Comcast's complaint is not with Mr. Elam's methodology, but with the weight he places on the data relied upon in his analysis.  Once again, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the best means of addressing admissible analyses about which reasonable experts might disagree.  <u>Daubert</u>, 509 U.S. at 596.

### b.  Method 2 apportions the invention's value.

Comcast's critiques of Mr. Elam's second method of apportionment are predicated largely on the alleged failures of Dr. Easttom's component counting analysis.  (Doc. S-229 at 18.)  After reiterating the purported flaws of Dr. Easttom's opinion, Comcast argues that "Mr. Elam adds no additional opinions that transform

Dr. Easttom's analysis into a reliable apportionment methodology," and that he "provides <u>no</u> analysis of how the patented features add value to X1." (<u>Id.</u> at 19.)  As noted, however, Comcast's critiques of Dr. Easttom's opinions go to the weight of his analysis and do not provide a basis to exclude the opinions of Mr. Elam.  Because the Court has already determined that Dr. Easttom's analysis is reliable, the Court will not address Comcast's efforts to reintroduce their critiques of Dr. Easttom's analysis in its motion to exclude the opinions of Mr. Elam.

Comcast argues that "Mr. Elam provides no analysis of how the patented features add value to X1" and instead "simply averages the weights provided by Dr. Easttom and applies that average (30%) to his royalty base."  (Doc. S-229 at 19.) This, Comcast argues, does not accurately account for the economic contribution of the patented functionality to the X1 platform.  (<u>Id.</u>)  The Court finds this argument unconvincing.

Mr. Elam's analysis follows the same methodology deemed admissible in <u>Shopify</u>, in which the patentee's damages expert relied on the patentee's technical expert's opinions on the technical importance of the patented features in his damages analysis.  2021 WL 4288113, at *20.  There, the alleged infringer sought to exclude the opinions of patentee's technical expert as well as the opinions of the patentee's damages expert based on the patentee's technical expert's analysis.  <u>Id.</u> Specifically, the alleged infringer contended, as Comcast does here, that the damages expert "fail[ed] to account for the incremental benefit of the patented invention over the prior art."  <u>Id.</u> at *21.  The court in <u>Shopify</u> found that because

27

the technical expert had isolated the incremental value of the patented features, and the damages expert, relying on the technical expert's report, had limited damages to the incremental benefit that the patented technology provided, the opinion was admissible.  Id.

Similarly, in Odyssey Wireless, Inc. v. Apple Inc., the court refused to strike a patentee's damages expert's opinion where the expert relied on a technical expert's report to conduct his apportionment analysis.  No. 15-CV-01735-H-RBB, 2016 WL 7644790, at *8 (S.D. Cal. Sept. 14, 2016).  The defendants argued that the technical expert's opinion that the patents in suit were responsible for 20 percent of the incremental benefit over the prior art was insufficient, as a matter of law, to support the damages expert's opinion as to the patented feature's value.  Id. at *12.  The court disagreed, explaining that "[t]he credibility of that opinion and the underlying evidence are matters for the jury, not the Court."  Id.  In particular, the court stated, "Defendants may disagree with [the damages expert]'s conclusion that the patents-in-suit qualify as high value patents.  But the test under Daubert is not the correctness of the expert's conclusions."  Id. (quotation omitted).

Finally, in Centripetal Networks, the court found a patentee's damages expert opinion reliable where the expert had relied on the technical apportionment analysis of the patentee's damages expert.  492 F. Supp. 3d at 597.  There, the technical expert, like Dr. Easttom, "opined on each of the infringing products, and determined how many of the top level functions were implicated by infringement of the asserted patents" and then "determined an apportionment percentage for each

of the infringing products based off this analysis." <u>Id.</u> at 596.  The damages expert then relied on this report and "applied these apportionment percentages to total sales revenues from the infringing products since the date of first infringement." <u>Id.</u> at 597.  In essence, the damages expert applied the technical expert's conclusions to the monetary value of the accused product—measured in total sales revenue—for the purposes of apportionment, and the court agreed with this analysis.  <u>Id.</u>

<u>Shopify</u>, <u>Odyssey Wireless</u>, and <u>Centripetal</u> are instructive.  Here, Dr. Easttom determined that the '431 Patent corresponded to, or infringed upon, 30 percent of the top level components in the X1 set top box.  (Doc. S-260-1 at 161.) Mr. Elam then applied this percentage to the implied value of the set top box to determine the value of the patented features specifically.  (<u>Id.</u> at 162.)  In doing so, Mr. Elam addressed the monetary value of the X1's allegedly infringing features. (<u>Id.</u>)  By applying Dr. Easttom's apportionment percentages to the sales price of the accused product, Mr. Elam employed a method that has been found reliable by a number of other courts to determine the economic contribution of the patented functionality to the accused platform.  Accordingly, Mr. Elam's second method of royalty rate calculation is admissible.

### 3. Mr. Elam's assignment of damages for years of purported post-trial, future infringement is not improper.

Finally, Comcast argues that even if Mr. Elam's damages calculations methods are admissible, they need to be limited because they effectively award "future damages" by running the royalty rate well beyond the scheduled trial date. (Doc. S-229 at 20.)  Under Comcast's construction of Mr. Elam's royalty rate,

Comcast could be required to pay for past harms years after the Court has entered a final judgment in this case.  (Id. at 19.)  The Court finds this construction and argument unfounded.

The patentee has the burden of proving damages and may elect, as WTV has done here, to seek compensation via the reasonable royalty the patentee would have received through arms-length bargaining with the alleged infringer.  See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1157 (6th Cir. 1978).  A reasonable royalty is an amount "which a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market at a reasonable profit."  Goodyear Tire and Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978, 984 (6th Cir. 1937).

Though "damages . . . by definition covers only past harm" not "future use of [the patentee's] patents," many courts have used reasonable royalty and damages interchangeably to reflect the form of compensation paid to a patentee after infringement has taken place.  Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 35 (Fed. Cir. 2012); see Panduit Corp, 575 F.2d at 1158 ("The setting of a reasonable royalty after infringement cannot be treated . . . as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees."); ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 872 (Fed. Cir. 2010) ("[A] reasonable royalty may permissibly reflect '[t]he fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty.'"

(quotation omitted)); <u>Applied Med. Resources Corp. v. U.S. Surgical Corp.</u>, 435 F.3d 1356, 1361 (Fed. Cir. 2006) ("Consistent with our precedent, reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed."); <u>AstraZeneca AB</u>, 782 F.3d at 1343.  ("The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" (quotation omitted)).

"As compared to lump-sum fees, royalty plans both draw out payments over time and tie those payments, in each month or year covered, to a product's commercial success." <u>Kimble v. Marvel Entertainment, LLC</u>, 576 U.S. 446, 453 (2015).  Reasonable royalties may run until the patent covered in the parties' hypothetically negotiated licensing agreement expires.  <u>Brulotte v. Thys Co.</u>, 379 U.S. 29, 30 (1964).  That is, the term of the licensing agreement is assumed to be the remaining life of the patent.  <u>See</u> <u>Scheiber v. Dolby Laboratories, Inc.</u>, 293 F.3d 1014, 1017 (7th Cir. 2002) ("When the patent term ends, the exclusive right to make, use or sell the licensed invention also ends.  Because the invention is available to the world, the license in fact ceases to have value.").

Mr. Elam states that the damages under both of his methods of apportionment extend through June 2026 because the '431 Patent is set to expire on July 10, 2026.  (Doc. S-260-1 at ¶¶ 2, 32.)  It is clear from Mr. Elam's report, however, that by damages, he means "running royalty."  (<u>See</u> Doc. S-260-1 at ¶ 31.) For example, he says "Comcast would have wanted to obtain a license for the '431

Patent from WTV until the expiration of the '431 Patent in July 2026." (Id. at ¶ 72.)

Later he says, "Comcast and WTV would have agreed to a non-exclusive,

sublicensable, running royalty license agreement" that would be assessed per set

top box "from September 2016 to July 2026." (Id. at ¶ 138.)  It is also worth noting

Comcast's rebuttal damages expert, Dana Trexler, also calculates a reasonable

royalty through 2026 up until the expiration of the '431 Patent.[6] (See Doc. S-261-3

at 14–15.)

Thus, by calculating his running royalty through 2026, Mr. Elam is not

including damages for future, post-trial infringement, as Comcast contends.

Instead, he seems to be stating that at the instance of first infringement, at the

time of the hypothetical negotiation, Comcast would have agreed to pay a royalty to

WTV to use the '431 Patent in its X1 device, and that the royalty would run through

the life span of the patent, specifically to 2026.

Accordingly, Comcast's motion to exclude Mr. Elam's expert opinions is due to

be denied.

## **CONCLUSION**

Rule 702 grants the Court discretionary authority to determine an expert's

reliability under the particular facts and circumstances of a given case.  See Kumho

Tire, 526 U.S. at 158.  Here, the Court finds that both Dr. Easttom's technical

---

[6] Ms. Trexler states that her "lump sum reasonable royalty" is "[c]alculated through August 20, 2026, the expiration of the '431 Patent." (Doc. S-261-3 at 14–15.)  Thus, Mr. Elam and Ms. Trexler seem to disagree about the exact day that the '431 Patent expires and, consequently, the precise length of the period through which a reasonable royalty should run.

analysis and Mr. Elam's damages analysis are admissible because they employ methodologies that have clearly been accepted within the relevant scientific and accounting communities in the context of determining a reasonable royalty rate. Accordingly, Comcast's Motions to Exclude the Opinions of Mr. Elam and Dr. Easttom (Doc. 222; Doc. 223) are **DENIED**.

      **ORDERED** at Fort Myers, Florida, on June 9, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE