UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WHEREVERTV, INC.,

    Plaintiff,

v.                                  Case No:   2:18-cv-529-JLB-NPM

COMCAST CABLE
COMMUNICATIONS, LLC,

    Defendant.

## ORDER

Before the Court is Plaintiff WhereverTV Inc.'s ("WTV") Motion to Strike Certain Opinions from Defendant Comcast Cable Communications, LLC's ("Comcast") Technology Expert, Professor Loren Terveen ("Prof. Terveen") (Doc. 225). Comcast has responded to the Motion, and WTV has replied. (Doc. 240; Doc. 257.) After careful review of the record, WTV's Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

WTV is a "television service provider that offers live-streaming video content" using a "wide range of internet enabled devices." (Doc. 30 at ¶ 11.) WTV is the assignee and owner of the '431 Patent. (Doc. 30-1.) The '431 Patent discloses a system and device "that employs a global interactive program guide to receive, access, manage, and view digital entertainment services such as live television,

television on demand, and pre-recorded video and audio programming." (Id. at 1.) Comcast, which is one of the largest cable television and internet providers in the United States, sells an entertainment platform known as the Xfinity X1 Platform ("X1"). (Doc. 30 at ¶ 24.) The X1 is "Comcast's premier cable service" and is alleged to "work[ ] the same way" as the claimed invention. (Doc S-230-1 at ¶¶ 115, 309.) In 2018, WTV filed suit in this Court, contending that Comcast has "directly infringed and continues to directly infringe all the claims of the '431 Patent . . . . by making, using, offering for sale, and selling the Xfinity X1 Platform." (Doc. 30 at ¶¶ 47–48.)

Comcast has provided an expert report from Prof. Terveen in which he opines that, among other things, the "certain patents" covered by one of Comcast's license agreements with another company are technologically comparable to the '431 Patent. (See Doc. S-259-2 at ¶¶ 239–48.) Prof. Terveen also analyzes the availability and acceptability of Comcast's proposed non-infringing alternative and lists some of Comcast's patents ostensibly related to the '431 Patent. (Id. at ¶¶ 221–38, 270.) WTV now moves to have the Court strike these opinions of Prof. Terveen, asserting that they are unreliable. (Doc. 225 at 5.)

## **LEGAL STANDARD**

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587 (1993)). This gatekeeping function aims "to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

In making Rule 702 determinations, district courts are afforded significant discretion. Kumho Tire, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Essentially, the Court is tasked with "ensuring that an expert's testimony . . . rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The "burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). Where the scientific principles underlying an expert opinion are found to lack "evidentiary

3

relevance and reliability," the expert opinion will be found inadmissible. Daubert, 509 U.S. at 595.

The Federal Circuit "appl[ies] regional circuit law to evidentiary issues." Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1324 (Fed. Cir. 2014); see also Micro Chem., Inc. v. Lextron, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit."). The Eleventh Circuit has instructed district courts to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998); Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010) (reaffirming the utility of this "rigorous three-part inquiry" after Rule 702 was amended in 2000 to provide three additional prerequisites (Rule 702(b)–(d)) for admissibility of expert testimony). While "there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." Frazier, 387 F.3d at 1260.

Here, WTV only challenges the second of the three factors outlined in City of Tuscaloosa: the reliability of the methodologies employed by Prof. Terveen in his

analysis of (1) the technological comparability between one of Comcast's past license agreements and the hypothetical license to WTV's '431 Patent and (2) the availability of Comcast's proposed non-infringing alternatives. (See Doc. 225.) This factor "entails a preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93. The reliability of an expert's methodology can be measured by, among other things, "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). The expert's methodology "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590 (quotation omitted). It is the Court's responsibility to determine such reliability "in light of the particular facts and circumstances of the particular case." Kumho, 526 U.S. at 158.

Still, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Id. Indeed, as the Eleventh Circuit has established, "[a] district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quotation omitted). Instead, "shaky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509

5

U.S. at 596. Ultimately, "where experts might reasonably differ," it is the factfinder that "must decide among the conflicting views of different experts." Kumho, 526 U.S. at 153 (citing Daubert, 509 U.S. at 596.)

## DISCUSSION

### A. Prof. Terveen's Opinions that "certain patents" from a license with a competitor are technologically comparable to the '431 Patent is not due to be excluded as unreliable.

WTV first argues that the Court should strike Prof. Terveen's opinion that "certain patents" covered by Comcast's license with a competitor are technologically comparable to the '431 Patent. (Doc. 225 at 11.) WTV takes issue with two parts of this opinion: (1) Prof. Terveen's alleged failure to identify which patents are technologically comparable and why they are comparable, and (2) whether the patents that he does specifically identify are, in fact, technologically comparable to the '431 Patent. (Id. at 12.) After closely reading Prof. Terveen's report, however, the Court finds that Prof. Terveen's opinion regarding the allegedly comparable licenses is based on a reliable methodology and therefore not due to be excluded under the Federal Rules of Evidence on this basis.

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs affixed by the court." 35 U.S.C. § 284. Where, as here, the patentee only seeks damages in the form of a reasonable royalty, litigants may calculate such a royalty via hypothetical negotiation, or the "willing licensor-willing licensee"

6

approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009). "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement." Id. at 1325.

In calculating a reasonable royalty, a number of circumstances are taken into account, known as the Georgia-Pacific factors. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The second Georgia-Pacific factor is "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." Id. at 1120. "This factor examines whether the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit." Lucent, 580 F.3d at 1325. "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011). It is improper to "rely on license agreements that were radically different from the hypothetical agreement under consideration to determine a reasonable royalty." Id. at 1316 (quotation omitted). However, the Federal Circuit "ha[s] never required identity of circumstances; on the contrary, [it] ha[s] long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." Virnetx, 767 F.3d at 1330 (quotation omitted).

Here, Comcast's technology expert, Prof. Terveen, relies on two license agreements to support his reasonable royalty analysis. (See Doc. 225-3 at 4.) WTV objects to the use of one of these license agreements—a September 8, 2017 agreement between Comcast and Company A ("the Company A license")[1]—arguing that the patents included in that license are not sufficiently comparable to the '431 Patent. (Doc. 225 at 11–21.) As the above-cited Federal Circuit precedent clearly states, Comcast must affirmatively show that the Company A license Prof. Terveen relies upon is actually comparable to the license that the parties would have negotiated for the '431 Patent.

WTV moves to exclude the testimony of Prof. Terveen to the extent Prof. Terveen opines that "the '431 Patent is technologically comparable to certain patents" covered in the Company A license agreement. (Doc. S-259-2 at ¶ 239.) Specifically, as noted above, WTV argues that "certain patents" is too vague, and that the '008 Patent, which is covered under the Company A license agreement, is not technologically comparable to the patent in suit. (Doc. 225 at 11–21.) Accordingly, WTV contends that Prof. Terveen's opinions regarding Comcast's license agreement with Company A for the use of patents comparable to the '431 Patent are conclusory, based on insufficient facts, and not in compliance with the minimum requirements of the Federal Circuit. (Id. at 14.)

---

[1] In order to avoid issues of third-party confidentiality, the pseudonym "Company A" is used throughout this order. The Motion to Strike including Company A's true name is under seal without opposition.

> i. **The phrase "certain patents" is not overly vague in the context of Prof. Terveen's opinion and the text of the Company A license agreement, and it is therefore based on reliable methodology.**

While Prof. Terveen begins his analysis of the Company A license agreement by stating that "certain patents" are covered by the license, the vast majority of his analysis deals with only one patent, the '008 Patent. (See id. at ¶¶ 239–48.) In fact, the only other patent even mentioned by name is the '587 Patent, which Prof. Terveen opines has the same specification as the '008 Patent and therefore can be analyzed jointly. (Id. at ¶ 248.) This account aligns with the Company A license agreement itself, which indicates that the only two patents included in the agreements that were not abandoned, lapsed, expired, cancelled, completed, or withdrawn were the '008 and '587 Patents. (Doc. S-259-3 at 13–14.)

Thus, Prof. Terveen's opinion regarding the technological comparability of certain patents covered under the Company A license agreement is limited—and must be limited under the terms of the agreement itself—to the '008 and '587 Patents. To the extent that the phrase "certain patents" appears to obliquely reference patents beyond the '008 and '587 Patents, such reference would be inappropriate; but based on the language of the agreement itself and the analysis provided in Prof. Terveen's opinion, the phrase "certain patents" refers only to the '008 Patent and the '587 Patent. Thus, because Prof. Terveen's use of the term "certain patents" appears cabined to only these two patents in the Company A license agreement, it is both relevant and reliable.

9

### ii. Prof. Terveen's opinion that the '008 Patent is technologically comparable to the '431 Patent is reliable because it is founded upon clear, thorough analysis and is therefore not impermissible ipse dixit.

WTV next moves to exclude the testimony of Prof. Terveen regarding the Company A license agreement on the grounds that the patents covered by this license agreement are not technologically comparable to the patent in suit. (Doc. 225 at 14–21.) Prof. Terveen's technological analysis is focused almost entirely on the '008 Patent, so WTV addresses only the '008 Patent in its argument that the '431 Patent invents a technology that is fundamentally different than the patents covered by the Company A license agreement. (See id. at 15–16.)

In particular, WTV argues that "the '008 Patent has nothing in common with the '431 Patent" because it "is not an interactive programming guide patent, and it has nothing to do with organizing or listing selectable television channels for receiving streaming programming." (Id. at 16.) WTV analogizes the relationship between the '008 Patent and the '431 Patent as a car to a road, stating "[a]n automobile may use a road, but it is not technologically comparable to a road." (Doc. 257 at 3 (emphasis in original).) Because of the fundamental differences that it notes between the two patents, WTV argues that the Court should strike Prof. Terveen's opinion that the two patents are technologically comparable. Comcast responds that the patents are sufficiently comparable because they are both directed towards improving the same aspects of the prior art, and "the purported benefit of both patents is to provide" the same "type of consolidated system" "using similar technology features." (Doc. S-259 at 14–15.)

10

The Federal Circuit has instructed that testimony regarding the technological comparability of patents from a past license agreement and the patent in suit is reliable even where those licenses did not "relate to the actual patents-in-suit" but instead "were drawn to related technology." VirnetX, 767 F.3d at 1330. That is, where the patents covered by the allegedly comparable licenses have "no relationship to the claimed invention" and no "discernable link to the claimed technology," reliance on such licenses is inappropriate. See ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010). But where the technology is merely different, the license may be presented to the jury so that the jury can "decide for itself what to accept or reject." ActiveVideo Networks, Inc. v. Verizon Comms., Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012); i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010). Ultimately, there is "no law requiring a technical expert to discuss the similarities and differences in scope between . . . the licensed claims and patents-in-suit or to go through every claim of the licensed patent in order to reliably opine that the licensed patents are 'comparable' to the patents-in-suit." Open Text S.A. v. Box, Inc., No. 13-CV-04910-JD, 2015 WL 393858, at *5 (N.D. Cal. Jan 29, 2015).

The Court finds that Comcast has met its burden of demonstrating that there is "a basis in fact to associate the royalty rates used in [these] prior licenses to the particular hypothetical negotiation at issue in [this] case." Uniloc, 632 F.3d at 1317. First, Prof. Terveen's conclusions about the technological comparability between the '431 Patent and the '008 Patent are not ambiguous conclusions, but rather, are

11

based on clear comparisons of the claims of the two patents. (See, e.g., Doc. S-259-2 at ¶ 245.) Prof. Terveen opines that the two patents are "directed to similar technology features," they "purport[] to offer the same types of benefits," and they "address the same types of problems." (Id. at ¶¶ 245–47.) Each of these opinions is substantiated by references to the text of each of the two patents outlining the specific functionalities of each.[2] (See id.) For example, Prof. Terveen states that "[t]he '008 Patent describes a digital content distribution system that integrates information and entertainment content such as movies, videos, and television programs to be delivered 'in a single subscription service,'" while "the '431 Patent states that it 'consolidates content from disparate sources . . . and allows for viewing from a single, customizable IPG,'" indicating that the two patents "offer the same types of benefits" to the user. (Id. at ¶ 246.)

This is not the type of "vague" or "loose" opinion that courts have found to be inadequate "to demonstrate technological comparability between" the licensed patent and the patent-in-suit. See Qualcomm Inc. v. Apple Inc., No. 17-CV-1375-DMS-MDD, 2019 WL 259756, at *4 (S.D. Cal. Jan. 18, 2019) (explaining that "the experts' opinions are conclusory in that they simply recite the claims and specifications of the licensed patents and then state that technology is comparable

---

[2] The '008 Patent states that it "relates to methods and apparatus for dynamically managing the digital assets of the endpoint servers based on aggregate profile information reflecting the preferences of the user population served by the endpoint server." (Doc. S-259-2 at ¶ 241.) The '431 Patent states that it "relates to an interactive program guide (IPG) application and device to receive, access, manage, and view digital entertainment services . . . via an internet-enabled device, anywhere in the world." (Doc. 30-1 at 13.)

to the technology underlying the patents in suit"); see also M2M Solutions LLC v. Enfora, Inc., 167 F. Supp. 3d 665, 678 (D. Del. 2016) (finding an expert's opinion unreliable where he "provide[d] little more than ambiguous conclusions of technological comparability between the two license agreements and the [patent-in-suit], without any rationale other than undisclosed conversations with [another expert]").

Instead, Prof. Terveen has "provided a factual basis and an explanation for his contention that the licenses are technologically comparable." See DataQuill Ltd. v. High Tech Comp. Corp., 887 F. Supp. 2d 999, 1022 (S.D. Cal. 2011) (holding that where an expert "explain[ed] in his report that based on his review of the materials cited in his report, the two technologies are of similar importance to the accused devices overall" the expert had "provided a factual basis and an explanation for his conclusion that the technology in the 'significant patent agreements' is comparable to the technology in the 'patents-in-suit'" and "provided a 'discernable link' to the claimed technology") (citing ResQNet, 594 F.3d at 870).

Accordingly, the Court finds that Prof. Terveen has sufficiently supported his opinion that the '008 Patent and the '431 Patent are technologically comparable. With this threshold met, any further quibbles over the degree of comparability of the license agreements are factual issues that should be submitted to the trier of fact and are "best addressed by cross examination and not by exclusion." ActiveVideo, 694 F.3d at 1333.

### B. Dr. Terveen's opinion that there are supposedly "many alternative designs available to Comcast" is due to be excluded because it lacks the requisite specificity and evidentiary support to be found reliable.

WTV further argues that the Court should strike Dr. Terveen's opinion that there are "many alternative designs available to Comcast." (Doc. 225 at 21–24.) In his expert report, Dr. Terveen opined that, "There are many alternative designs available to Comcast for the accused X1 functionalities." (Doc. S-259-2 at ¶ 221.) Specifically, he stated that in addition to the two alternative designs described by Jessica Sant, the leader of Comcast's Entertainment Client Technology Team, "additional alternatives would be available, including changing the features that allegedly add or delete channels." (Id.) WTV argues that the Court should strike this opinion, and after reviewing the opinion and the relevant caselaw, the Court agrees.

While a proposed non-infringing alternative need not be on the market to be considered available and acceptable, it must be more than merely conjectural. "Mere speculation or conclusory assertions will not suffice to overcome the inference of non-availability," so the Court must "proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1353 (Fed. Cir. 1999); see also Sherwin-Williams Co. v. PPG Indus., Inc., No. CV 17-1023, 2020 WL 1283465, at *9 (W.D. Pa. Mar. 18, 2020) (holding that "[v]ague references" by the accused infringer that a non-infringing alternative "might exist will not suffice," nor

will mere "speculation that [the accused infringer] might have been able to design a non-infringing alternative").

The alleged infringer must "identify and provide information regarding alleged acceptable non-infringing alternatives." ICM Controls Corp. v. Honeywell Int'l Inc., No. 512-CV-1766-LEK-ATB, 2021 WL 3403734, at *3 (N.D.N.Y. Aug. 4, 2021). Using "vague and general language" that does not identify proposed non-infringing alternatives by name and announcing the existence of certain employees "having knowledge of alternatives is not a substitute for its obligation to identify alleged acceptable non-infringing alternatives." Id. Not only must the proposed alternatives be specifically noted, but their availability and acceptability must also be substantiated with record evidence. Conceptus, Inc. v. Hologic, Inc., 771 F. Supp. 2d 1164, 1179 (N.D. Cal. 2010) (holding that the accused infringer must "point to any research-and-development documentation, deposition testimony, or sworn declarations that might demonstrate [its] capacity to implement noninfringing alternatives during the period of alleged infringement"). Specific identification of the proposed non-infringing alternative is all the more important in the context of reasonable royalty calculations where the proposed designs are purely hypothetical. See Smart Skins LLC v. Microsoft Corp., No. C15-544-MJP, 2016 WL 4148091, at *2 (W.D. Wash. July 1, 2016) (agreeing with patentee that the accused infringer "bears the burden to identify acceptable non-infringing alternatives" particularly where "none of the alleged non-infringing alternatives were on the market during the damages period").

15

Here, Comcast has specifically identified two hypothetical non-infringing alternatives that it argues it could have designed and implemented during the damages period.  (See Doc. S-261-2 at 5–6, 29–30.)  Though the Court found that Comcast has introduced sufficient evidence for a jury to reasonably determine that the "external federated model" and "multiple repository model" were acceptable and available during the infringement period, this finding was based, in part, on Dr. Terveen's testimony that "Comcast had all of the necessary equipment, know-how, and experience to use" both of these proposed design alternatives.  (See Doc. 282 at 18–19 (quoting Doc. S-259-2 at ¶¶ 226, 234).)  Dr. Terveen described in specific terms how Comcast could implement both of these models by reconfiguring the X1 device using technologies and materials in existence at the time of the hypothetical royalty negotiation.  (Doc. S-259-2 at ¶¶ 225, 234–35.)

This level of specificity is not found with respect to the "many" other alternative models, which Dr. Terveen alludes to only vaguely in his expert report. Without further detail regarding these other models, including one which could "add or delete channels," the Court cannot allow Prof. Terveen's opinion that, "There are many alternative designs available to Comcast for the accused X1 functionalities" to be introduced into evidence.  This statement is misleading as it creates the impression that Comcast has identified with the requisite specificity, and substantiated with the appropriate evidence, certain acceptable and available non-infringing alternatives beyond the external federated model and multiple repository model identified by Ms. Sant.  But based on the record evidence before

16

the Court, only the external federated model and the multiple repository model have been adequately proposed by Comcast as acceptable and available during the damages period.

Unlike an opinion identifying a specific proposed alternative design, an opinion that there are "many other alternative designs" is not best addressed via cross-examination or by submission to the jury because it is vague and speculative and does not "rest[] on a reliable foundation." Daubert, 509 U.S. at 597.  Without research-and-development documentation, deposition testimony, or sworn declarations attesting to the potential existence of these many other alternatives, a factfinder would be left to guess at Comcast's design and implementation capabilities.  In such cases, "[n]o amount of cross-examination could cure this fundamental lack of reliability."  See Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc., No. 16-CV-13456, 2019 WL 3334563, at *6 (E.D. Mich. July 25, 2019). Accordingly, Prof. Terveen's opinion that there are "many alternative designs available to Comcast" beyond the external federated model and the multiple repository model is stricken.

### C. Dr. Terveen's listing of Comcast patents is not due to be excluded because it assists the trier of fact in understanding the value of the '431 Patent to Comcast.

Finally, WTV seeks to have the Court exclude the last section of Prof. Terveen's report in which he lists a number of Comcast's patents related to user access to video content, interactive program guides, and voice control and recognition.  (Doc. 225 at 24–25; Doc. S-259-2 at ¶ 270.)  The Court finds that while

this list is analytically sparse, it is not unreliable or irrelevant and thus, it is not due to be excluded.

Comcast argues that WTV "fails to provide <u>any</u> reason why the opinions that Prof. Terveen renders" in his list of some of Comcast's other patents should be excluded. (Doc. S-259 at 22 (emphasis in original).) But this criticism is misplaced. Instead, it appears that this last challenge to Prof. Terveen's report is brought under the third factor of expert opinion admissibility outlined in <u>City of Tuscaloosa</u>, namely, whether "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." 158 F.3d at 562. Specifically, WTV argues that Prof. Terveen "does not provide any analysis or explanation relating to this list" and "does not offer any technical comparison between any of these patents, on the one hand, and any asserted claims of the '431 Patent, on the other." (Doc. 225 at 24–25.) Further, Prof. Terveen is alleged to "not offer any facts, information, or opinions to suggest how Comcast may be using these patents, if at all." (<u>Id.</u> at 25.)

But WTV's apparent argument that the list is unhelpful to understand the evidence or determine a fact in issue is undercut by its later complaint that Comcast's damages expert, Dana Trexler ("Ms. Trexler"), relies on this list in her damages opinion. (<u>Id.</u>) Specifically, Ms. Trexler states, "I understand that Comcast has an extensive patent portfolio of thousands of active United States Patents. I understand from Prof. Terveen that many of those patents relate to the types of technology that are at issue in this case." (Doc. S-259-1 at ¶ 111.) She goes on to

18

draw a number of conclusions about the value of the '431 Patent to Comcast based on this list of patents provided by Prof. Terveen.  (Id.)

Insofar as Prof. Terveen's list of patents aids Ms. Trexler in her damages analysis, the claim that this portion of Prof. Terveen's opinion should be excluded because it "does not provide any analysis or explanation" or "does not offer any facts, information, or opinions" is unsupported.  If WTV takes issue with Ms. Trexler's conclusions based on Prof. Terveen's list of patents, the more appropriate place to challenge such conclusions would be in its motion to exclude her opinions, (Doc. 221).  An expert's opinion should not be excluded merely because it is relied upon by another expert to substantiate that expert's allegedly inadmissible opinions.  See Monsanto Co. v. David, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703.").

Here, if the patents listed by Prof. Terveen are not comparable to the '431 Patent, WTV can address this issue on cross examination or through the testimony of its own expert witness.  After all, the Federal Circuit has been clear that this is the appropriate approach where the issue in question "is one of evidentiary weight and not admissibility."  Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1322 (Fed. Cir. 2014).  Thus, Prof. Terveen's opinion listing the Comcast patents he believes are related to the technology implicated by the patent-in-suit is not due to be stricken because it is relevant and, as outlined in Ms. Trexler's report, it may provide

assistance in determining the value of the '431 Patent to Comcast at the time of the hypothetical royalties negotiation.

## CONCLUSION

WTV's Motion to Strike Certain Opinions from Comcast's Technology Expert Dr. Terveen (Doc. 225) is **GRANTED IN PART** and **DENIED IN PART**. In particular, the Court finds that:

(1) Prof. Terveen's opinion that "certain patents" from the Company A license are technologically comparable to the '431 Patent is not due to be excluded to the extent that the phrase "certain patents" applies only to the '008 Patent and the '587 Patent.

(2) Prof. Terveen's opinion that the '008 Patent (and by implication the '587 Patent) are technologically comparable to the '431 Patent is not due to be excluded.

(3) Prof Terveen's opinion that there are supposedly "many alternative designs available to Comcast," beyond the external federated model and the multiple repository model, is inadmissible and therefore is stricken.

(4) Prof. Terveen's list of fifteen Comcast patents is not due to be excluded.

**ORDERED** at Fort Myers, Florida on July 14, 2022.

_____
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE