UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WHEREVERTV, INC.,

        Plaintiff,

v.                                   Case No:   2:18-cv-529-JLB-NPM

COMCAST CABLE
COMMUNICATIONS, LLC,

        Defendant.

_____

## ORDER

      Before the Court is Plaintiff WhereverTV Inc.'s ("WTV") Motion to Exclude Expert Testimony of Defendant Comcast Cable Communications, LLC's ("Comcast") Damages Expert, Dana Trexler ("Ms. Trexler").  (Doc. 221.)[1]  Comcast has responded to the Motion, and WTV has replied.  (Docs. 241, 252.)  After careful review of the record and applicable law, WTV's Motion is **DENIED**.  WTV will, however, be permitted the opportunity to move for leave to file a surrebuttal expert damages report consistent with this Order.

## BACKGROUND

      WTV, a television service provider, has sued Comcast for patent infringement and seeks reasonable royalty damages.   (Doc. 30; Doc. S-260-1 at ¶ 31; Doc. S-260-2

---

[1] An unredacted copy of the Motion is on file in Chambers consistent with the Court's Order at Doc. 206.

at ¶ 70.)  To better understand the instant motions, a brief description of the procedural history is helpful.  On May 21, 2021, WTV provided an expert report from Kyle Elam ("Mr. Elam") on the issue of damages.  (See Doc. S-260-1.)  Comcast then produced an expert report from Ms. Trexler in rebuttal on July 9, 2021.  (See Doc. S-260-2.)  Ms. Trexler's report refutes the accuracy of many of Mr. Elam's damages opinions and proposes alternative methods of calculation.  (Id.)  To substantiate these alternative methods, Ms. Trexler opines on apportionment, comparable licenses, and non-infringing alternatives.  (See id.)

WTV now moves to exclude Ms. Trexler's alternative damages calculations opinions, asserting that they are procedurally and substantively impermissible.  WTV argues that Ms. Trexler's opinions are "affirmative opinions" that are outside the scope of a permissible rebuttal and that, even if the opinions were within the scope of a permissible rebuttal, her analyses of apportionment, comparable license agreements, and non-infringing alternatives are not reliable.  (Id. at 17–30.)

## LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1360 (Fed. Cir. 2008) ("Patent cases, like all other cases are

governed by Rule 702.  There is, of course, no basis for carving out a special rule as
to experts in patent cases.").

"Rule 702 compels the district courts to perform the critical 'gatekeeping'
function concerning the admissibility of expert scientific evidence."  United States v.
Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting Daubert v. Merrell Dow
Pharm., Inc., 509 U.S. 579, 587 (1993)).  This gatekeeping function aims "to make
certain that an expert, whether basing testimony upon professional studies or
personal experience, employs in the courtroom the same level of intellectual rigor
that characterizes the practice of an expert in the relevant field."  Kumho Tire Co.
v. Carmichael, 526 U.S. 137, 152 (1999).

In making Rule 702 determinations, the Court is tasked with "ensuring that
an expert's testimony . . . rests on a reliable foundation and is relevant to the task
at hand."  Daubert, 509 U.S. at 597.  Importantly, a trial court must be sure that
its review of expert testimony focuses "solely on principles and methodology, not the
conclusions that they generate."  Id. at 592–94.  The reliability of an expert's
methodology can be measured by, among other things, "(1) whether the expert's
theory can be and has been tested; (2) whether the theory has been subjected to
peer review and publication; (3) the known or potential rate of error of the
particular scientific technique; and (4) whether the technique is generally accepted
in the scientific community."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326
F.3d 1333, 1341 (11th Cir. 2003).

Still, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Tech. DC-8, 326 F.3d at 1341. Indeed, as the Eleventh Circuit has established, "[a] district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quotation omitted). Instead, "shaky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596. And "where experts might reasonably differ," it is the factfinder, not the Court, that "must decide among the conflicting views of different experts." Kumho, 526 U.S. at 153. The sole purpose of the Court's gatekeeping function under Rule 702 is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion. Daubert, 509 U.S. at 592–93.

As the Federal Circuit has stated, this limitation on the gatekeeping role of the judge with respect to excluding "testimony based on unreliable principles and methods is particularly essential in the context of patent damages." Apple Inc. v. Motorola Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above the minimum threshold) may go to the testimony's weight, but not its admissibility." See id. (citation omitted). Where a trial court is faced with a motion exclude an expert's damages opinion, alleging that the expert relied on "unreliable methodology," the Federal

4

Circuit has instructed that it is the role of the trial court to evaluate whether the expert was legally erroneous in his methodology to compute reasonable royalty damages.  Micro Chem., Inc v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Before presenting a damages number to the jury, the patentee must establish that its calculation is based on concrete facts and employs a reliable methodology. See, e.g., Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1315 (Fed. Cir. 2011) (citing Daubert, 509 U.S. at 591).  As a matter of law, an expert cannot introduce a damages theory to the jury without establishing the reliability of that theory.  See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324, 1335 (Fed. Cir. 2009) (vacating damages award where the "jury's damages award [was] not supported by substantial evidence but is based mainly on speculation or guesswork.")  Review of the legal methodology underlying an expert's opinion is within the role of the trial court.  See Micro Chem., 317 F.3d at 1393–94.  Reliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable.  See id. at 1393 (finding that a discussion of whether a damages expert relied on unreliable methodology involved an analysis of the underlying principles of patent damages law).

## DISCUSSION

WTV moves to strike the opinions of Ms. Trexler on several grounds.  These grounds boil down to the contention that the Trexler Report is not a rebuttal report because it provides affirmative damages opinions, and that because it is not a rebuttal report it was untimely served on WTV.  (Doc. 221 at 11–17.)  In the

5

alternative, WTV argues that even if the Trexler Report is a proper rebuttal report and was thus timely served, Ms. Trexler's damages opinion is unreliable.  (Id. at 17–30.)

> **I.** **The Trexler Report is a proper rebuttal report because it addresses the same subject matter as WTV's Elam Report.**

First, WTV argues that the Trexler Report "sets forth opinions improper for rebuttal" under Federal Rule of Civil Procedure 26(a)(2)(D)(ii)[2] by including Ms. Trexler's own affirmative damages opinions.  (Doc. 221 at 13.)  Comcast counters that Ms. Trexler's Report is a proper rebuttal report "because the entire report responds to and contradicts Mr. Elam's analysis."  (Doc. S-260 at 9.)  The Court agrees with Comcast.  The caselaw is clear that a rebuttal of a patent damages report need not be tailored precisely to align with the theories and methodologies employed in the opposing party's case-in-chief.  Instead, rebuttal reports may introduce "nuanced differences" in opinions and conclusions where those differences "still are offered to rebut the opinions and conclusions offered by [the opposing party's] identified experts."  ITT Corp. v. Xylem Grp., LLC, No. 1:11-cv-3669-WSD, 2012 WL 12871632, at *5 (N.D. Ga. Oct. 15, 2012).  Accordingly, Ms. Trexler's rebuttal expert opinions are not due to be excluded for failure to comply with Rule 26(a)(2)(D)(ii).

---

[2] Rule 26(a)(2)(D)(ii) provides that a party must disclose expert testimony "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure."  Fed. R. Civ. P. 26(a)(2)(D)(ii).

"[F]or procedural matters that are not unique to patent issues, [the Federal Circuit] appl[ies] the perceived law of the regional circuit." In re Regents of the University of California, 101 F.3d 1386, 1390 n.2 (Fed. Cir. 1996). "The test under Rule 26(a)(2)(D)(ii) is not whether a rebuttal report contains new information, but whether it is intended solely to contradict or rebut evidence on the same subject matter of an opponent's expert report." Teledyne Instruments, Inc. v. Cairns, No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274, at *17 (M.D. Fla. Oct. 25, 2013) (quotation omitted). The term "same subject matter" as used in Rule 26(a)(2)(D)(ii) has been construed broadly. Northrup v. Werner Enter., Inc., No. 8:14-cv-1627-T-27JSS, 2015 WL 4756947, at *2 (M.D. Fla. Aug. 11, 2015). Often, a rebuttal expert is permitted to use new methodologies for the purpose of rebutting the assumptions of another expert. See Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc., No. 18-CV-63130, 2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020); see also Fuller v. SunTrust Banks, Inc., No. 1:11-CV-784-ODE, 2019 WL 5448206, at *22 (N.D. Ga. Oct. 3, 2019). "Courts are empowered to exercise their discretion and judgment in determining if a rebuttal expert report addresses the same subject matter as the opposing party's initial expert report." Lebron v. Royal Caribbean Cruises, Ltd., No. 16-24687-CIV, 2018 WL 3583002, at *2 (S.D. Fla. July 26, 2018).

Still, a rebuttal opinion should not be used to advance new arguments or present new evidence because "[r]ebuttal testimony is permitted only when it directly addresses an assertion raised by an opponent's experts." In re Trasylol Prods. Liab. Litig., No. 1:09-MD-01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6,

2010) (citation omitted).  In the context of patent damages, courts have found that where a rebuttal expert's report "presents entirely new damages calculations . . . attempts to tie these new calculations to [the opponent's damages expert]'s report are improper." D'Andrea Bros. LLC v. United States, No. 08-286C, 2012 WL 644010, at *4 (Fed. Cl. Feb. 10, 2012) (finding that "new calculations, first introduced in [a] rebuttal report[] are improper rebuttal testimony").  A "party may not offer testimony under the guise of a 'rebuttal' only to provide additional support for his case in chief." Noffsinger v. The Valspar Corp., No. 09 CV 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011).  A "rebuttal expert report is not the proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." Ebbert v. Nassau Cnty., No. CV 05–5445, 2008 WL 4443238, at *13 (E.D.N.Y Sept. 26, 2008) (quotation omitted).  However, "the fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal." Donell v. Fid. Nat. Title Agency of Nev., No. 2:07-CV-00001-KJD-PAL, 2012 WL 170990, at *5 (D. Nev. Jan. 20, 2012) (quotation omitted).

Here, Ms. Trexler's report is clearly intended as a rebuttal.  First, it was prepared on July 9, 2021—the due date designated for rebuttal reports under Rule 26(a)(2)(D)(ii)—and it was labeled as a "Rebuttal Expert Damages Report."  (Doc. S-260-2 at 2.)  Ms. Trexler also states that the report contains her "analysis and opinions regarding the determination of damages in this case" and her "opinions with respect to the damages claimed by [WTV], as set forth in the Expert Report of

8

Kyle P. Elam." (<u>Id.</u> at 9, ¶ 4.)  Thus, as a threshold matter, the Trexler Report

meets the technical requirements of a rebuttal expert report under the Federal

Rules.  <u>See</u> Fed. R. Civ. P. 26(a)(2)(D)(ii) (permitting a party to file a rebuttal expert

report "if the evidence is intended solely to contradict or rebut evidence on the same

subject matter identified by another party['s]" initial expert witness).

      The Trexler Report also addresses the same subject matter as the Elam

Report.[3]  Like Mr. Elam, Ms. Trexler considers a hypothetical licensing negotiation

and applies the same fifteen <u>Georgia-Pacific</u>[4] factors to arrive at a reasonable

royalty.  Both reports assess the availability of certain non-infringing alternatives

and the effect such non-infringing alternatives might have on an appropriate

---

[3] WTV seeks to strike "Section VI (except part VI(D)(5)) and Section VIII (except paragraphs 346, 350, 351, 359, and 372 and note 750)" as impermissible affirmative damages opinions.  (Doc. 221 at 7 n.2.)  In Section VI, Ms. Trexler lists various forms of evidence relevant to what she believes is an appropriate damages calculation.  And in Section VIII, Ms. Trexler applies the fifteen <u>Georgia-Pacific</u> factors to support her damages opinion.  The paragraphs, footnotes, and subsections isolated by WTV within Section VI and Section VIII as not due to be stricken are those that mention Mr. Elam or the Elam Report by name.   But rebuttal expert reports need not address the opposing party's expert report by name in every single paragraph to be deemed an acceptable rebuttal expert opinion.  <u>See</u> <u>Biomet Orthopedics, Inc. v. Tact Med. Instruments, Inc.</u>, No. 3:01-cv-895-PS, 2004 WL 5499504, at *2 (N.D. Ind. Apr. 7, 2004) (finding that "while it is true Dr. Keegan's supplemental report does not mention Mr. Sims or his expert report, there is no requirement that Dr. Keegan mention Mr. Sims by name when offering opinions to contradict or rebut those offered by Mr. Sims"); <u>Romano v. John Hancock Life Ins. Co. (USA)</u>, No. 19-21147-CIV, 2022 WL 1447733, at *36–37 (S.D. Fla. May 9, 2022) (holding that the Federal Rules of Civil Procedure do not require rebuttal experts to follow a "specific formula" requiring them to first "identify with particularity the opinion stated by the opposing expert (and include the opposing expert's name)").

[4] <u>Georgia-Pac. Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116 (S.D.N.Y. 1970).

amount of damages.  Finally, both Mr. Elam and Ms. Trexler conduct apportionment analyses to determine the correct proportion of the profits from sales of a product embodying an infringing feature to the infringing feature.  While the Trexler Report strays occasionally from the Elam Report in terms of methodology, the Court finds that such departures are "nuanced differences" in opinions and conclusions, which are "still are offered to rebut the opinions and conclusions offered by [the opposing party's] identified experts." ITT Corp., 2012 WL 12871632, at *5. And in any event, mere differences of technique are permitted in rebuttal opinions where such new techniques are employed to critique an opposing party's affirmative damages opinion.  Scott, 315 F.R.D. at 44.

TC Systems Inc. v. Town of Colonie, New York, in which a district court was faced with an expert report and a rebuttal expert report presenting different theories for calculating fees, is instructive.  213 F. Supp. 2d 171, 180 (N.D.N.Y. July 19, 2002).  There, the court endeavored to assess the meaning of "same subject matter" under Rule 26(a)(2)(D)(ii) and while comparing the two experts' reports, the court found:

> [The rebuttal expert]'s report may have broaden[ed] the "subject matter" by interjecting concepts meant to support his rebuttal.  These concepts, though could also be construed as an independent, fresh opinion on the matter.  Thus, if the Court broadly interprets "same subject matter," [the rebuttal expert] was properly identified as a rebuttal expert witness.  If, on the other hand, the Court narrowly interprets "same subject matter," to restrict expert witnesses to not only the same subject matter but, in essence, the same methodology, [the rebuttal expert] was not properly identified as an expert witness.  As noted earlier, neither the Advisory Committee Notes nor case law provide any guidance on this issue.  The Court is reluctant to narrowly construe the phrase "same subject matter" beyond its plain language.  To accept Plaintiffs'

contention would impose an additional restriction on parties that is not included in the Rules.

Id.

The TC Systems court ultimately decided to deny plaintiffs' motion to preclude defendant's rebuttal expert's testimony.  Id. at 181.  Similar to the defendant's expert's opinion in TC Systems, Ms. Trexler's report broadened the subject matter of an appropriate damages calculation by interjecting different methods of calculating a reasonable royalty that were not employed in Mr. Elam's report.  These methods could "be construed as an independent, fresh opinion on the matter," but like the court in TC Systems, this Court is not in the business of "restrict[ing] expert witnesses to not only the same subject matter but, in essence, the same methodology."  TC Systems, 213 F. Supp. 2d at 180.  Such a narrow construction of "same subject matter" is not required by the Federal Rules of Civil Procedure and will not be employed here.  Accordingly, the Court determines that Ms. Trexler's rebuttal damages opinions is not due to be excluded merely because it is not hemmed in precisely by the methods, data, and analysis of Mr. Elam's report.

Nevertheless, because Comcast's rebuttal expert report includes methodologies to which WTV has not had an opportunity to respond, WTV may seek leave to file a surrebuttal opinion if it so desires.  See Hanover Ins. Co. v. United States, 137 Fed. Cl. 479, 487 (Fed. Cl. Apr. 12, 2018) (explaining that a surrebuttal can cure any prejudice a party may face as a result of an opposing party's expert's report).

**II.    The Trexler Report was not untimely served under the Federal Rules of Civil Procedure or the operative CMSO because it is a rebuttal report.**

Next, WTV argues that Trexler's opinions were untimely and should be stricken under Federal Rules of Civil Procedure 37(c)(1) and 16(b).  (Doc. 221 at 7.) Comcast argues that the Trexler Report was timely because it is a rebuttal report, not an affirmative damages opinion, and it was served in compliance with the operative CMSO.  (Doc. S-260 at 8–9.)  The Court agrees with Comcast and finds that because Ms. Trexler's report was a proper rebuttal report within the meaning of Rule 26, it was served on time.

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  This disclosure must include a written report containing a complete statement of all opinions the expert plans to express and the basis for them, the data considered by the expert in forming the opinions, and any exhibits the expert intends to use to summarize or support the opinions, among other things.  See Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi).  These disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  "Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and prevent surprise . . . compliance with the requirements of Rule 26 is not merely aspirational."  Cooper v. Southern Co., 390 F.3d 695, 728 (11th Cir. 2004) (citation omitted).

To this end, Rule 37(c)(1) provides a sanction for untimely expert reports. Rule 37(c)(1) states that if a party fails to provide the information required by Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009) (quotation omitted). "In addition to or instead of [exclusion], the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure [to disclose]; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions." Fed. R. Civ. P. 37(c).

Substantial justification is "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." Ellison v. Windt, No. 6:99-cv-1268-Orl-KRS, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001) (quotation omitted). Failure to make the required disclosures in a timely manner is harmless when there is no prejudice to the party entitled to receive the disclosure. See Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc., No. 6:03-cv-1860-Orl-19-KRS, 2005 WL 2465020, at *2 (M.D. Fla. Oct. 6, 2005). The party failing to comply with Rule 26(a) bears the burden of establishing that its non-disclosure was either substantially

justified or harmless.  See Sur. Assocs., Inc. v. Fireman's Fund Ins. Co., No. 3:02-cv-223-J16-TEM, 2003 WL 25669165, at *2 (M.D. Fla. Jan. 7, 2003).

The operative scheduling order—issued on February 1, 2021—provided that WTV's expert reports were due on May 21, 2021, Comcast's expert reports were due on June 18, 2021, and both parties' Rule 26(a)(2)(D)(ii) rebuttals were due on July 9, 2021.  (Doc. 181 at 1.)  On February 8, 2021, counsel for Comcast emailed counsel for WTV with a summary of a call between the parties related to discovery.  (Doc. 241-1 at 2–3.)  That email states:

> Comcast explained that it understood the schedule to be as follows:
> a. May 21, 2021: WTV serves reports for issues on which it bears the burden (infringement and damages)
> b. June 18, 2021: Comcast serves reports for issues on which it bears the burden (invalidity)
> c. July 9, 2021: Comcast serves its noninfringement and damages reports, and WTV serves its validity report.

(Id. at 3.)[5]

Finally, pursuant to the Court's Local Rules, the parties met and conferred about the substance of their Daubert motions on August 26, 2021.  (Doc. 241 at 8.)  According to Comcast, "WTV did not raise its purported concerns about the scope of

_____

[5] The email does not, however, state that WTV agreed to this understanding of the schedule.  Instead, the only mention of WTV's understanding of the Amended CMSO is that "WTV indicated it would consider the Scheduling Order's final paragraph and that it expected the parties could come to agreement."  (Id.)  But the final paragraph of the Amended CMSO pertains to the setting of deposition dates for experts, not the setting of dates for service of expert reports which are clearly outlined in the Amended CMSO.  (Doc. 181 at 2.)  Accordingly, the idea that WTV would have agreed to the service of affirmative damages opinions on the date set for rebuttal opinions seems far-fetched.  In fact, WTV has since stated "WTV did not agree to this . . . and WTV would certainly never have agreed[] that Comcast could submit new theories in rebuttal."  (Doc. 241 at 7; Doc. 252 at 5.)

14

Ms. Trexler's report at the conference, or at any other time before filing the instant motion."  (Id.)

The operative CMSO states that Rule 26(a)(2)(D)(ii) disclosures were due on July 9, 2021, and Comcast's email summarizing the call indicates that it intended to serve its damages report on July 9, 2021.  (Doc. 181 at 1.)  Ms. Trexler's rebuttal report is dated July 9, 2021, and, as outlined in the preceding section, Ms. Trexler's report was a proper rebuttal report.  Accordingly, Ms. Trexler's rebuttal report was timely served, and it is not in violation of Rule 26(a)(2)(D)(ii), nor does it warrant sanctions under Rule 37(c).

### III.  Ms. Trexler's apportionment methodology is reliable because it has substantial overlaps with approaches taken by the Federal Circuit under similar circumstances.

Next, WTV argues that even if Ms. Trexler's rebuttal report was procedurally permissible, there are still substantive Daubert issues rendering her opinion excludable.  (Doc. 221 at 17.)  First, WTV contends that Ms. Trexler's apportionment theory is unfounded and unreliable.  (Id. at 18.)  Specifically, WTV alleges that "Trexler cites no authority or evidence for her methodology" and that "Trexler's approach is not even aimed at the right question."  (Id. at 19–20.)  Comcast counters that Ms. Trexler's apportionment analysis is admissible because it is based on an approach that the Federal Circuit has approved of in the past, and it is grounded in legally sufficient facts.  (Doc. S-260 at 14–19.)  The Court finds for the reasons below that Ms. Trexler's apportionment analysis employs a reliable methodology.

The Federal Circuit has recognized that "estimating a reasonable royalty is not an exact science" and "there may be more than one reliable method for estimating a reasonable royalty." Summit 6, LLC v. Samsung Electronics Co., Ltd., 802 F.3d 1283, 1296 (Fed. Cir. 2015).  The admissibility of such approximations hinges on the reliability of the methodology employed to arrive at the approximations.  Daubert, 509 U.S. at 589–95.  Where the data used is not sufficiently tied to the facts of the case, an otherwise scientifically valid methodology will be deemed unreliable.  LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 78–81 (Fed. Cir. 2012) (holding that the district court erred in permitting the jury to hear an expert's damages testimony concerning a royalty rate derived from irrelevant inputs).  "But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and the of the results produced thereunder belong to the factfinder." Summit 6, 802 F.3d at 1296.

"[A] reasonable method for determining a reasonable royalty is the hypothetical negotiation approach, which attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Summit 6, 802 F.3d at 1299 (quotation omitted). In determining an accurate reasonable royalty, "[t]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." LaserDynamics, 694 F.3d at 67 (quoting ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d

860, 869 (Fed. Cir. 2010)).  The Federal Circuit has repeatedly held that apportionment is required where, as here, the accused technology does not make up the whole of the accused product.  Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC, 879 F.3d 1332, 1348 (Fed. Cir. 2018).  Proper apportionment requires that "a royalty should reflect the value of [the] patented technology."  Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019).  In assessing the appropriate reasonable royalty, "all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features."  Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc., 809 F.3d 1295, 1301 (Fed. Cir. 2015).

Here, Ms. Trexler has deemed the appropriate royalty base for her reasonable royalty calculations to be the income that Comcast receives from the X1's over-the-top ("OTT") content—essentially video programming derived from Comcast's partnerships with streaming services.  (Doc. S-260-2 at ¶ 183.)  She elects this base because WTV has alleged that the interactive programming guide in Comcast's X1 Platform infringes on the '431 Patent by allowing users to access video programing from OTT content providers.  (Id. at ¶ 64.)  Thus, under Ms. Trexler's apportionment theory, the income that Comcast receives from its OTT partnerships—which provide content from streaming services to users through the X1's interactive programming guide—is equivalent to the economic benefit to Comcast of the X1's alleged infringement of the '431 Patent.  (Id. at ¶¶ 273–84.)

Ms. Trexler then calculates a royalty rate by determining the percentage of Comcast's operating and capital expenditures in its video line of business which were related to "Software and Intangibles" at the time of the hypothetical royalty negotiation.  (Id. at ¶¶ 171, 180, 183.)  Such expenditures, which include "both internal product development and licenses for third-party software," are alleged to represent Comcast's investments in the interactive programming guide.  (Id. at ¶¶ 180, 182.)  Ms. Trexler then applies this apportionment rate to the royalty base of Comcast's income generated from its relationships with OTT content providers.  (Id. at ¶ 183.)  The presumption of this analysis—which is challenged by WTV—is that Comcast's investments in the "Software and Intangibles" portion of its video line of business can be considered a reliable approximation of the amount of OTT income attributable to the '431 Patent.  (Doc. 221 at 19.)

Cost-based apportionment, which compares the relative cost of the infringing activity or component to the overall cost, is a widely used method of performing apportionment analysis.  American Institute of CPAs, *Forensic Valuation Services Practice Aid: Calculating Damages in Intellectual Property Disputes* 108 (4th ed. 2019).  Critical to this analysis, however, is that the costs of the components represent the components' value to the invention.  See In re Avaya Inc., No. 17-10089-SMB, 2018 WL 1940381 at *8–9 (Bankr. S.D.N.Y. Apr. 23, 2018), aff'd, In re Avaya Inc., 602 B.R. 445, 461 (S.D.N.Y. 2019) (apportioning damages in a patent-related bankruptcy case by calculating "the cost or price of [the misappropriated] component [as] compared to the cost of the entire multi-component product").

For example, courts have excluded expert opinions employing cost-based apportionment methods where the connection between the cost of a particular component and the value that component contributed to the accused device as a whole was too attenuated.  See Albritton v. Acclarent, Inc., No. 3:16-cv-03340-M, 2020 WL 11627275, at *11 (N.D. Tex. Feb. 28, 2020) (holding that "[w]hen multiple components operate together, any individual component is not necessarily valuable in and of itself.  Instead, it is the component's function and contribution to the larger operation of the device as a whole from which the component derives value").

Here, Comcast's "software and intangibles" expenses are said to represent the cost of the allegedly infringing interactive programming guide ("IPG") as compared to the cost of Comcast's video line of business.  (Doc. S-260-2 at ¶¶ 181–82.)  Ms. Trexler's analysis addresses the Albritton court's concerns in that it aims to ensure that Comcast's investment in IPG-related technology is an appropriate metric to determine the value of the allegedly infringing functionality.  2020 WL 11627275, at *11.  Ms. Trexler does so by connecting the investments that Comcast has made in its video line of business "to offer its technology platform and attract and maintain its subscriber base" with the profits that "Comcast derives from its OTT relationships that [are] attributable to the Patent-in-Suit."  (Doc. S-260-2 at ¶ 181.)  The '431 Patent's "function and contribution to the larger operation of the device as a whole" is understood through the prism of Comcast's investments in growing its video subscriber base.  This makes sense given that the profits Comcast earns from the accused technology are inherently affected by the number of consumers

19

streaming video through Comcast's OTT relationships.  Albritton, 2020 WL 11627275, at *11; (Doc. S-260-2 at ¶ 181.)

Mr. Elam appears to also recognize this relationship, opining that the value of the IPG's functionality can be measured, in part, by the number of Comcast customers who chose not to "cut the cord" because Comcast had integrated OTT applications.[6]  (See Doc. S-260-1 at ¶¶ 61–74.)  The implication of Mr. Elam's analysis is that by investing in connecting Comcast subscribers to streaming services through the IPG, Comcast effectively invested in growing its subscriber base.  In turn, per Ms. Trexler's analysis, by investing in growing its subscriber base, the value of Comcast's OTT relationships attributable to the patent-in-suit also increased.  (See Doc. S-260-2 at ¶ 181.)  Thus, the Court finds that Ms. Trexler's apportionment methodology is a reliable form of measuring the value of the '431 Patent's contribution to the X1 relative to other investments made by Comcast.

Further, the Federal Circuit has affirmed damages expert opinions where the expert has relied on methods similar to those utilized by Ms. Trexler.  For example, in Summit 6, the Federal Circuit found that a damages expert's methodology was "based on reliable principles and was sufficiently tied to the facts of the case" where the expert calculated a reasonable royalty based on the production cost of the

---

[6] Notably, Ms. Trexler refutes this analysis, opining that in a survey of former Comcast customers who had "cut the cord," only a small fraction "said they cut the cord because they were 'satisfied with online streaming.'"  (Doc. S-260-2 at ¶ 142 n. 346.)

particular infringing feature and the income derived from that particular infringing feature, relative to the entire device. See 802 F.3d at 1296–98. The methodology followed by the expert in Summit 6 has notable similarities to the methodology followed by Ms. Trexler.

First, the expert determined the percentage of the overall production cost for a phone which was attributable to the infringing method—technology which resized photos shared over text message. Id. at 1297. He then estimated the amount that phone carriers paid the infringing phone manufacturer to include such a camera component in its phones. Id. at 1296–97. From these data points, the expert estimated the dollar amount in revenue that the infringing phone manufacturer made per phone, which was attributable to the phone's camera's functionality. Id. at 1297. Next, the expert estimated the percentage of phone users who used the camera to perform the infringing methods, namely taking pictures on their phones and sending them over text message. Id. By multiplying this percentage by the revenue per phone attributable to the infringing methods, the expert determined the dollar amount of profit per phone attributable to infringement. Id.

There are substantial overlaps between the expert in Summit 6's process and Ms. Trexler's process. Ms. Trexler determined the amount Comcast invested into the X1's allegedly infringing interactive programming guide, estimated the income generated by Comcast's OTT partnerships—the functionality that helps to make the interactive programming guide desirable to consumers—, and approximated the

amount of OTT income attributable to the '431 Patent.  <u>Summit 6</u> therefore supports a finding that Ms. Trexler's analysis is reliable.

It is also worth noting that WTV does not challenge the appropriateness of Ms. Trexler's identification of the income that Comcast receives from the X1's OTT content as an appropriate royalty base.  If such income is found to be an appropriate royalty base, Comcast's investment in services and programs to increase such income are not "inapposite" and the ramifications of using such investments in calculations are not "absurd."  (<u>See</u> Doc. 221 at 22.)  Courts have often found that an alleged infringer's investments may be credited back to the infringer during a hypothetical royalty negotiation in the form of a reduction in damages, but that such a crediting is a question for the jury.  <u>KAIST IP US LLC v. Samsung Elecs. Co.</u>, 439 F. Supp. 3d 860, 890 (E.D. Tex. 2020), <u>appeal dismissed sub nom. KIPB LLC v. Samsung Elecs. Co.</u>, No. 2020-1619, 2020 WL 9175080 (Fed. Cir. Sept. 3, 2020) ("The jury was free to consider Samsung's adduced testimony about these investments, but it was also free to credit KAIST's expert's analysis about these factors and conclusions that they did not entitle Samsung to a reduction in the royalty to be paid.").  In sum, WTV's criticisms go to the weight of the evidence proffered Ms. Trexler, not to the reliability of her methodology.  Determining whether Comcast's investments in growing its customer base would diminish the amount of damages appropriate for infringement of the '431 Patent is a question better suited to a trier of fact.

IV.   **Ms. Trexler's comparable-license theory's methodology is reliable because it provides the jury with a basis to evaluate the comparability of the proposed licenses.**

Next, WTV contends that Ms. Trexler's opinions regarding comparable license theories are not reliable because she does not discuss the relevant terms of the agreements, some of the materials analyzed are so heavily redacted that it is difficult to tell whether the terms included are actually comparable, and in any event, the agreements are not comparable.  (Doc. 221 at 24–30.)  Comcast responds that there is no requirement that an expert discuss every portion of a licensing agreement for her analysis to be reliable, the redacted portions flagged by WTV concern another licensee and are not related, and the licenses are, in fact, comparable.  (Doc. S-260 at 22–23.)  The Court agrees with Comcast and finds that Ms. Trexler's comparable license methodology is relevant and reliable.

Licenses relied on by the patentee in proving damages should be "sufficiently comparable to the hypothetical license at issue in suit."  Lucent, 580 F.3d at 1325 (citing Russell L. Parr, *Royalty Rates for Licensing Intellectual Property* 64 (2007) ("For similar license agreements to be used as a proxy for derivation of a fair market royalty, the form of license compensation should be on a like-kind basis.")). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." LaserDynamics, 694 F.3d at 79.  The Federal Circuit has cautioned that "district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies other than the patent in suit" and "must

account for differences in the technologies and economic circumstances of the contracting parties." ResQNet, 594 F.3d at 869; Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1211 (Fed. Cir. 2010).  Still, the Federal Circuit "ha[s] never required identity of circumstances." VirnetX, 767 F.3d at 1330.  So long as the jury has been provided with "a basis to evaluate the comparability of the [third party] license and the hypothetical negotiation in this case," the royalty rate in the two licenses will not be considered "untethered [to] the patented technology at issue." Opticurrent, LLC v. Power Integrations, Inc., No. 17-cv-03597-EMC, 2019 WL 2389150, at *12 (N.D. Cal. June 5, 2019), aff'd, 815 F. App'x 547 (Fed. Cir. 2020).  At bottom, it is within the province of the jury to ferret this out.

### A. There is no requirement that an expert must review the complete third-party agreement to establish comparability.

WTV's first issue with Ms. Trexler's comparable license analysis is that Ms. Trexler did not review complete versions of the agreements that she claims are comparable licenses.  (Doc. 221 at 25–28.)  WTV has not pointed to any caselaw requiring a damages expert to review the entirety of the third-party licensing agreement, however.  For example, WTV relies on Pavo Solutions LLC v. Kingston Tech. Co., Inc., to support the proposition that where the record lacks evidence of comparability between a third-party license and the license in the hypothetical negotiation, an expert's testimony on such comparability is due to be excluded.  No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163, at *5 (C.D. Cal. Nov. 20, 2019), aff'd, 35 F.4th 1367 (Fed. Cir. 2022).  But in Pavo, the district court excluded the expert's opinion based on a finding that the expert had effectively gone rogue and

substituted one type of missing data (actual sales) with an unrelated type of available data (number of stores).  Id.  The Pavo court reasoned that this went "too far" because the data relating to actual sales was "critical information bearing on . . . comparability."  Id.

Here, no such critical data is alleged to be lacking.  Instead, in the first license agreement identified by Ms. Trexler, WTV complains of undefined descriptive terms as well as portions of the license agreement which appear to concern other licensees, do not relate to Comcast's financial obligations to the licensor, or bear on Comcast's relationship with a patent licensing membership service, not the licensor itself.  (See Doc. 221 at 26; Doc. S-260-4 at 6–7, 12–13.)  The second license agreement discussed in Ms. Trexler's report is entirely unredacted.  (Doc. S-260-7.)  And the accompanying letter from a financial institution indicating Comcast's proposed bid on the license is also largely unredacted, except for a portion of the agreement which appears to relate to a second bidder.[7]  (Doc. S-260-6 at 2.)

Unlike the missing terms in Pavo, these missing terms are not "critical information bearing on comparability."  Pavo, 2019 WL 8138163 at *5.  It is uncontested that Ms. Trexler's opinions on the two comparable licenses are confined to the text of the two agreements, the invoice, and the letter describing Comcast's bid.  Thus, Ms. Trexler has not "compensated for this lack of information with

---

[7] While WTV now complains that without more information, these materials fail to conclusively establish the price that Comcast paid to the licensors, such objections do not go to the reliability of Ms. Trexler's methodology.  See Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-cv-03999-BLF, 2015 WL 4129193, at *3 (N.D. Cal. July 8, 2015).

largely unsubstantiated use of" other, irrelevant data, as the expert in Pavo did.

See id. Accordingly, because there is no obvious analytical gap between the data

and Ms. Trexler's opinion, Ms. Trexler's comparability opinions relying on the two

licensing agreements are not due to be excluded.

### B. WTV's stated challenge to Ms. Trexler's comparability analysis goes to the weight of the evidence, not the reliability of her methodology.

WTV's second challenge to Ms. Trexler's comparable license analysis is that

the license agreements she relies upon are not comparable. (Doc. 221 at 28.)

Specifically, WTV asserts that because the two license agreements were arranged

through "member-based companies whose objective is to provide defensive buying

services to paying members," such transactions could not possibly mirror the

hypothetical royalties negotiation between WTV and Comcast. (Id. at 29.)

Ostensibly, this latter form of royalties negotiation would be aimed at monetizing

the invention, while the former would be geared towards discounting market prices

in order to serve member buyers. (Id. at 29–30.)

WTV and Comcast have agreed to use the hypothetical negotiation or the

"willing licensor-willing licensee" approach for calculating reasonable royalty

damages. (See Doc. S-260-2 at ¶¶ 71–72.) Parties frequently rely on comparable

license agreements to support a reasonable royalty analysis. See Georgia-Pacific

Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y 1970). "Assessing

the comparability of licenses requires a consideration of whether the license at issue

involves comparable technology, is economically comparable, and arises under

comparable circumstances as the hypothetical negotiation." Bio-Rad Laboratories, Inc. v. 10X Genomics Inc., 967 F.3d 1353, 1372–73 (Fed. Cir. 2020).  The Federal Circuit has repeatedly cautioned that the "degree of comparability" of the license agreements is a "factual issue[ ] best addressed by cross examination and not by exclusion."  ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012); Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility"); Bio-Rad, 967 F.3d at 1373 ("[T]he issue of comparability is often one of sufficiency of the evidence, not admissibility.").  And even if the licenses are not perfectly comparable, expert testimony on comparability may still be admissible.  See e.g., ActiveVideo, 694 F.3d at 1333 (affirming district court's decision to allow damages expert's testimony relying on two agreements, one of which did not involve the technologies involved in the case); Finjan, 626 F.3d at 1211–12 (affirming damages award where damages expert introduced a comparable license relating to a lump sum payment rather than a running royalty).

Here, Ms. Trexler's assessment of two license agreements Comcast negotiated through membership organizations has shown a baseline comparability between those licenses and the hypothetical negotiation.  To the extent that WTV doubts such comparability given the presumptive bargaining positions of the organizations, such doubts are factual in nature and would be best addressed through cross examination.  While the Court recognizes WTV's concerns that license agreements

27

obtained through membership organizations may be profit minimizing, without further evidence in support of this concern, Ms. Trexler's reliance on such licenses meets the requirements of reliability.  See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F. Supp. 3d 928, 948 (N.D. Cal. Mar. 31, 2015).  Ultimately, "[s]haky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  Daubert, 509 U.S. at 596.

> **V.**    **While Ms. Trexler's assessment of non-infringing alternatives and relevant patents is underexplained, it would be better to address such analytical shortcomings through cross-examination or surrebuttal rather than exclusion.**

Finally, WTV argues that Comcast has failed to present sufficient evidence to show that any of the alleged non-infringing alternatives were available at the time of the hypothetical negotiation.  (Doc. 221 at 30.)  WTV also challenges Ms. Trexler's reliance on a list of fifteen patents included at the end of the expert report of Comcast's technical expert, Professor Loren Terveen ("Prof. Terveen").  (Id.)  The Court has addressed both of these concerns in prior orders.  (See Doc. 282 at 16–19; Doc. 301 at 17–20.)  Specifically, the Court found that Comcast has presented sufficient evidence to establish that its proposed non-infringing design alternatives may have available during the damages period.  (Doc. 282 at 18.)  Thus, Ms. Trexler's opinions relying on such specifically enumerated non-infringing alternatives are not due to be excluded.  Still, WTV is correct to note that Ms. Trexler's damages theories based on non-infringing alternatives will fail if it is ultimately found that the alleged alternatives were not available at the time of the

hypothetical negotiation.  (See Doc. 252 at 7); SynQor, Inc. v. Artesyn Tech., Inc.,
709 F.3d 1365, 1382 (Fed. Cir. 2013).

The Court has also determined in a prior order that Prof. Terveen's list of
fifteen patents in his technical report was admissible to the extent that it was
relevant, reliable, and in fact relied upon by Ms. Trexler in her damages report.
(Doc. 301 at 17–20.)  Ms. Trexler lists the patents that Prof. Terveen has described
as having some sort of bearing on the types of technology at issue here.  (Doc. S-260-
2 at ¶¶ 112–13.)  She then considers this list of patents in her damages analysis as
evidence that "even assuming Comcast infringes the '431 Patent, that patent is only
a small piece of the intellectual property that contributes to an application like the
X1."  (Id. at ¶ 111.)  That is, in Ms. Trexler's view, because Comcast has numerous
other relevant patents in its patent portfolio, "the '431 Patent is of little value to
Comcast."  (Id.)

Ms. Trexler's opinion here is sufficiently tied to the facts of the case, but the
Court finds the methodology employed by Ms. Trexler to reach her conclusion to be
underexplained.  It is entirely conceivable that while Comcast may have had dozens
of patents related to the technology at issue, none of those patents could have had
the precise functionality of the '431 Patent.  Indeed, one can have a hub and spokes
but no wheel.  See TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 901 (Fed. Cir.
1986) ("Mere existence of a competing device does not make that device an
acceptable substitute."); Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d
1152, 1162 n.9 (6th Cir. 1978) ("There are substitute products for virtually every

patented product; the availability of railroads and box cameras should not of itself diminish royalties payable for infringement of the right to exclude others from making and selling the Wright airplane or the Polaroid camera.").  Furthermore, because Prof. Terveen's listed patents were not offered as strict substitutes, but merely as patents owned by Comcast in the relevant field, there is no indication that such patents are not non-infringing.  See Panduit, 575 F.2d at 1162 (finding that no reduction can be allowed where the alleged infringer's similar devices are infringing rather than strict substitutes).

Ms. Trexler's opinions as to Comcast's other patents and the effect such patents would have on damages therefore appear to be little more than conclusory statements about how the jury should interpret the evidence.  Despite such concerns, the Court finds that the scant analysis provided by Ms. Trexler with respect to Comcast's existing patents in the field would be better resolved by cross-examination or surrebuttal expert report, as it is ultimately a question of fact whether the existence of these other patents might serve to diminish the amount of damages owed to WTV if infringement is found.  See i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010) ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury.  The jury was entitled to hear the expert testimony and decide for itself what to accept or reject.").  Ultimately, the Court must take care not to transform a Daubert motion into a trial on the merits.  See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).  The trier of fact in this case is entitled to hear Ms.

Trexler's testimony and decide whether to accept or reject that testimony after considering her credibility and the predicate facts on which she relies. The Court finds that Ms. Trexler's analysis of the list of related patents is not due to be excluded.

**CONCLUSION**

For the foregoing reasons, WTV's Motion to Exclude Expert Testimony of Defendant's Damages Expert Dana Trexler (Doc. 221) is **DENIED**. WTV will be permitted to request leave to file a surrebuttal. In the interests of judicial economy and moving this case toward resolution, however, WTV shall not identify a new expert witness purely for the purposes of surrebuttal. Rather, Mr. Elam will be permitted to address WTV's stated concerns related to Sections VI and VIII of Ms. Trexler's report in a surrebuttal opinion. WTV shall make any such request on or before September 12, 2022.

**ORDERED** in Fort Myers, Florida on September 4, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE