# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

WHEREVERTV, INC.                    §
                                    §
                    Plaintiff,      §
                                    §
        v.                          §
                                    §   No. 2:18-cv-00529-WFJ-NPM
COMCAST CABLE                       §
COMMUNICATIONS, LLC,                §
                                    §
                    Defendant.      §
                                    §

# COMCAST'S RULE 50(A) MOTION FOR
# JUDGMENT AS A MATTER OF LAW
# (INFRINGEMENT AND DAMAGES)

# TABLE OF CONTENTS

P<span>AGE</span>

I.   INTRODUCTION ........................................................... 1

II.   LEGAL STANDARD ....................................................... 5

III.   COMCAST IS ENTITLED TO JMOL OF NON-INFRINGEMENT. ............... 6

    A.   Users cannot add or delete channels to or from the X1 IPG. .............. 7

    B.   There was not sufficient evidence of an IPG application
        installed on the X1 set-top box. ........................................... 16

IV.   WHEREVERTV DID NOT PRESENT LEGALLY SUFFICIENT
    EVIDENCE OF APPORTIONMENT. ........................................... 19

V.   CONCLUSION ............................................................. 25

# TABLE OF AUTHORITIES

PAGE

## Cases

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.,*
    811 F.3d 1334 (Fed. Cir. 2016) ............................................................... 6

*Bradium Techs. LLC v. Iancu,*
    923 F.3d 1032 (Fed. Cir. 2019) ............................................................. 16

*Cal. Inst. of Tech. v. Broadcom Ltd.,*
    No. 16-cv-3714-GW (AGRX), 2019 WL 8807926 (C.D. Cal. Nov. 21, 2019) ..... 23

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.,*
    206 F.3d 1440 (Fed. Cir. 2000) ............................................................. 13

*Droplets, Inc. v. Yahoo! Inc.,*
    No. 12-CV-03733-JST, 2022 WL 2670163 (N.D. Cal. Jan. 12, 2022) ............... 24

*Ericsson, Inc. v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014) ..............................................5, 20, 22

*Garretson v. Clark,*
    111 U.S. 120 (1884) ...................................................................5, 20

*Hipp v. Liberty Nat'l Life Ins. Co.,*
    252 F.3d 1208 (11th Cir. 2001) .............................................................. 6

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.,*
    162 F.3d 1290 (11th Cir. 1998) .............................................................. 6

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967, 983 (Fed. Cir. 1995) ......................................................... 15

*Omega Patents, LLC v. CalAmp Corp.,*
    13 F.4th 1361 (Fed. Cir. 2021) ............................................................. 22

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................1, 13, 14, 15

*Sprint Commc'ns Co. v. Comcast IP Holdings, LLC,*
    No. 12-cv-1013-RGA, 2015 WL 410342 (D. Del. Jan. 29, 2015) ..................... 23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) ............................................................................ 2

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ........................................................ 25

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) .......................................................... 2

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308, 1329 (Fed. Cir. 2014) .............................................. 25

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*,
  No. 10-CV-10578, 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) ...................... 24

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .......................................................... 11

**Rules**

Fed. R. Civ. P. 50(a) .......................................................................... 6

**Other Authorities**

Webster's Third New Int'l Dictionary, Merriam-Webster (2002) ....................... 15

## I.     INTRODUCTION

WhereverTV has the burden of proving that the accused system—Comcast's X1 platform—performs every limitation of claim 1 of the '431 Patent.  In its case-in-chief, however, WhereverTV failed to present sufficient evidence from which a reasonable jury could find that at least two claim limitations ("adding or deleting channels" and "an interactive program guide [IPG] application installed on the device") are met; nor could a reasonable jury award damages on the basis of the admissible trial evidence.  Accordingly, the Court should grant Comcast judgment as a matter of law of non-infringement and no damages.

Contrary to its trial narrative, WhereverTV does not have a government-granted monopoly on "integrating" cable channels with alternative content offerings such as Netflix.  On the contrary, the sole asserted claim recites a specific device on which is installed an IPG application that allows for specified user configurations.  However, Comcast's IPG application is not installed on the accused device—the X1 set-top box ("STB")—and X1 does not permit a user to add or delete channels to or from the IPG.

Conspicuously absent from WhereverTV's trial presentation has been any meaningful acknowledgment of the specification of the '431 Patent.  Its technical expert even took the position that the specification "has nothing to do with whether someone infringes or not."  4/20 Tr. at 274:2-3 (Easttom).  That is obviously wrong—the specification is the "single best guide" to what the claims cover.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)

(citation omitted); *see Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).  And here, the specification confirms that the X1 system does not infringe claim 1 of the '431 Patent.

The patent begins with an "Abstract," which summarizes the invention disclosed and claimed.  The Abstract says, among other things:  "As disclosed, the global [IPG] provides a user with metadata that describes available content and enables the user to access desired content on an a la carte basis and arrange the presentation of that content in any way or order desired."  JTX-001 ("the '431 Patent") at 1. But an X1 customer cannot "arrange the presentation of [the video] content in any way or order desired."  On the contrary, the linear channels (such as Epix) and apps (such as Netflix) that are available through the X1 guide are set by Comcast and cannot be altered by the user.  It is "[e]ngineers within Comcast [who] control" which apps (and linear channels) are available; "[t]here's no way for a customer to add an app or remove it."  4/21 Tr. at 83:24, 84:4-5 (Sant).

The patent's specification goes on to describe "the present invention," which refers to the claimed invention.  4/20 Tr. at 84:2-6 (Cavicchia); *id.* at 263:12-18 (Easttom).  And many Federal Circuit cases confirm that a patent's description of the "present invention" functions as a disclaimer that "limits the scope of the invention."  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).  Here is how the patent describes "the present invention":

> The present invention allows a user to access and view the same content through an identical IPG anywhere in the world an Internet

connection is available and is based on user-defined preferences, not content availability restrictions provided by a content-provider or consolidator, such as an MSO.  The present invention provides access directly with content owners, as well as MSOs, so users are not limited to an MSO or content "middleman" who limits or controls what content is available.  The present invention is not associated with a specific MSO, although it may be integrated on a data level with one or more MSO IPGs to receive and organize programming content and metadata as the user would experience at home. The user can also manage independent content subscriptions and add, delete programming channels in "realtime" that might not be available through subscribed-to MSO's (i.e. a user with a subscription to Time Warner Los Angeles and Comcast Philadelphia might not have access to China's CCTV5 television, but could subscribe directly with CCTV5 and integrate this channel into the IPG). ...

The present invention allows a user to move from location to location and easily acquire, organize and view digital entertainment content from one or more independent content sources (including channel listings, programming information, and saved content) via a "follow me" personalized global IPG that is available on any device that is connected to the Public Internet. The goal is to shift the control of content availability, organization, and access from MSO's, which is today's cable television model, to a new user-centric model where the user can choose whether or not to purchase content from a content consolidator or directly from independent content providers.

Additionally, the user can also organize channels based on personal preferences. For the Los Angeles user mentioned previously, Channel 8 on the IPG would always present ESPN, no matter what location-Los Angeles, Las Vegas, Shanghai, etc. Programming that is available from independent content providers (i.e. via a website or IP-based subscription service) can also be configured in a similar fashion.

JTX-001 at 6:4-51.  This description does not describe Comcast's X1 system at all.

As just one (dispositive) example, the patent discloses that the "present invention" would allow a Comcast subscriber to add CCTV5 to the guide; but this cannot be done.  That fact should put an end to this lawsuit.

The patent also illustrates the steps of adding a channel:



*Id.* at Fig. 8. The specification walks through this logic flow in a way that makes abundantly clear that "subscribing" (and "authenticating") are different processes than "adding" (and "assigning") a channel. *See id.* at 15:13-16:7. Among other things, an X1 user cannot perform step 810 (i.e., "USER ASSIGNS CHANNEL #s TO EACH NEW CONTENT 'CHANNEL'"). The specification makes clear that this "adding" step follows (and is distinct from) the steps of "subscribing" to content and "authenticating" the user's access rights.

Finally, claim 1 recites the requirements of the claimed invention:

> 1. A content manager device comprising:
>
> a server resident on a network containing descriptive program data about video content available from one or more multiple cable system operators (MSOs) and one or more non-MSOs;

4

a device capable of establishing and maintaining a connection with the network via a communications link; and

***an interactive program guide application installed on the device that provides user-configurable interactive program guide (IPG) listing at least one channel of video content available from each of the one or more MSOs and each of the one or more non-MSOs*** and descriptive program data from the server for the video content available on each of the channels, wherein each of the channels is selectable for receiving only or virtually entirely streaming video programming from its respective MSO or non-MSO source via the communications link and the network; wherein the server is distinct from at least one of the one or more MSOs and one or more non-MSOs, and ***wherein the application allows for the IPG to be configured by a user with respect to adding or deleting channels from any of the one or more MSOs or the one or more non-MSOs***.

*Id*. at 16:32-54 (emphasis added).  In this motion, Comcast focuses on the two highlighted limitations—"adding or deleting channels" and "interactive program guide [IPG] application installed on the device."  WhereverTV's evidentiary showing was so deficient as to both that no reasonable jury could find infringement.

WhereverTV's admissible evidence is also insufficient to meet its burden to apportion damages to reflect "the value attributable to the infringing features of the product, and no more," as courts require.  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2014); *see Garretson v. Clark*, 111 U.S. 120, 121 (1884).  Judgment as matter of law should be granted on this ground as well.

## II.   LEGAL STANDARD

The Court may grant JMOL if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue."  Fed. R. Civ. P.

50(a).  The Court must consider "all the evidence in the light most favorable to the nonmoving party, and independently determine whether the facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict." *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1308 (11th Cir. 1998).  "Motions for directed verdict ... need not be reserved for situations where there is a complete absence of facts to support a jury verdict." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)).  "Rather, there must be a substantial conflict in evidence to support a jury question." *Id.* (quoting *Carter*, 870 F.2d at 581).

## III.   COMCAST IS ENTITLED TO JMOL OF NON-INFRINGEMENT.

WhereverTV asserts that Comcast's X1 Platform infringes only claim 1 of the '431 Patent. *See* 4/19 Tr. at 147:22-148:2 ("There's only one independent claim left.").  To establish literal patent infringement, a patentee must prove that "every limitation recited in the claim is found in the accused device." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016).  The evidence presented during WhereverTV's case-in-chief is not sufficient to permit a reasonable jury to find that the X1 platform performs either the "adding or deleting" limitation or the "installed on the device" limitation.  *See* JTX-001 at 16:32-54.[1]

---

[1] Comcast continues to preserve its challenge to the Court's erroneous construction of the "distinct from" claim limitation to require that the server be "functionally" distinct from at least one of the
(....continued)

**A.      Users cannot add or delete channels to or from the X1 IPG.**

First, no reasonable jury could conclude that the X1 system meets the claim limitation that "the application allows for the IPG to be configured by a user with respect to *adding or deleting channels* from any of the one or more MSOs or the one or more non-MSOs." JTX-001 at 16:51-54 (emphasis added).[2]

**1.** Jessica Sant of Comcast, who WhereverTV chose to call in its case-in-chief, was unequivocal on this point:

> Q. Please describe how a user can add an app or delete an app from the IPG.
>
> A. It's not possible. All the apps that are available to a customer are listed here.  There's no way for a customer to add an app or remove it.
>
> Q. Why not?
>
> A. It's simply not how the system was designed.  The system was designed so that all applications are available to the customer, and there's no way for the customer to install, uninstall, or add or remove an app.

4/21 Tr. at 84:1-10; *see id.* at 82:19-83:2 ("[A]ll channels, whether or not a customer is subscribed, looks exactly the same within the grid guide. ... Whether a customer is subscribed to a channel or not, it'll be listed here.  All available channels are listed in the grid guide."); *id.* at 85:8-12 ("The user is not able to add

---

one or more MSOs and one or more non-MSOs.  Doc. 302 at 15.  Under a proper construction of this limitation, the trial evidence is not sufficient to establish infringement.

[2] The "adding or deleting channels" limitation was disputed at the claim-construction phase. Comcast proposed the following construction: "adding channels to the IPG that, absent such adding, are not otherwise displayed in the IPG, or deleting channels from the IPG such that, after deletion, the channel is no longer displayed in the IPG."  Doc. 95 at 29.  WhereverTV, by contrast, argued that the terms should be given their "plain and ordinary meaning" by the jury.  Doc. 172 at 8.  The Court held that no further construction of this claim limitation was necessary.  *Id.* at 8-9.

or remove the rows.  The rows that exist are all there[.]  There's no way to add or remove them.").  Ms. Sant made clear that preventing users from adding or deleting apps (and linear channels or other content) was an important choice in the design of the X1 system to ensure that "Comcast can really control what content is available to our customers so we can provide a really high-quality experience so there's not any rogue content on the system and we can really maintain a really high-level experience."  4/21 Tr. at 92:21-25.

This contrasts starkly with the aims of the '431 Patent's inventor.  As Mr. Cavicchia testified, the invention was designed to allow users to be "able to receive content from anywhere," 4/19 Tr. at 251:14-15 (Cavicchia), and the patent discloses that the invention was designed to prevent an MSO (that is, a cable operator such as Comcast) from "limit[ing] the user to an IPG organized and controlled by the MSO … [and] preventing access to and integration with independent content sources," '431 Patent at 3:5-39.  The '431 Patent was thus designed to allow users to add and delete channels of their own choosing while the X1 system was designed to prevent that very same activity.

In addition to the unequivocal testimony from Ms. Sant refuting WhereverTV's infringement case, WhereverTV's minimal evidence on this limitation included only testimony from the '431 Patent's inventor, Mr. Cavicchia, *see* 4/20 Tr. at pp. 28-35, and WhereverTV's technical expert, Dr. Easttom, *see* 4/20 Tr. at pp. 138-47, 221-229, 284-294.  Just two exhibits were admitted into evidence on this subject: the '431 Patent itself (JX 1), and a video prepared by

*Comcast's* expert, Dr. Terveen, showing that subscribing to a linear channel (Epix) does not "add" that channel to the X1 IPG (DX 204) because the IPG was unchanged before and after subscribing. All of this evidence confirmed that the X1 system does not allow users to add new channels to the IPG or delete existing ones from the IPG and that Comcast—not the user—is in control of which channels appear and do not appear on the X1 IPG.

Even more important is what evidence WhereverTV did *not* adduce: Neither Mr. Cavicchia nor Dr. Easttom was able—on the stand, under oath, and subject to cross-examination—to *add or delete* any channel to the X1 guide, even though Dr. Easttom was "crystal clear" that "Claim 1 requires adding or deleting channels to the IPG." 4/20 Tr. at 284:23-285:1. The hours of testimony from Mr. Cavicchia and Dr. Easttom on other topics cannot fill this hole in the center of WhereverTV's case. It was WhereverTV's burden to *prove* that a Comcast subscriber can add or delete a channel to the X1 IPG. If this could be done, it should have been straightforward for a WhereverTV witness to configure the X1 IPG by adding a new channel to the guide or by deleting an existing channel from the guide. Yet WhereverTV introduced *no such evidence*. The dog that didn't bark in the night confirms that the X1 system does not practice the "adding or deleting channels" limitation.

The '431 Patent provides clear disclosure and examples of what it means to add or delete channels; yet WhereverTV did not even try to prove that an X1 user can perform these disclosed examples. The patent describes how, as part of

9

adding a channel to the IPG, "[t]he new content source's relevant metadata (i.e. channel listings, program listings, program duration, etc.) is imported from the independent content source into the global IPG" and "[t]he user [is] prompted to assign a channel for each channel of content."  JTX-001 at 15:25-30.  The patent also gives the example of adding the CCTV5 channel: "[A] user with a subscription to Time Warner Los Angeles and Comcast Philadelphia might not have access to China's CCTV5 television, but could subscribe directly with CCTV5 and integrate this channel into the IPG."  *Id.* at 6:19-22.

It was incumbent on WhereverTV to prove that a Comcast subscriber can add or delete channels to/from the X1 IPG.  The most obvious way would have been by following the specification and adding new content to the X1 IPG.  But WhereverTV provided *no evidence* that this can be done (because it cannot). Instead, the evidence showed that the channels, apps, and metadata from all available content sources already appears in the X1 guide.  *See, e.g.*, 4/20 Tr. 286:9-12 (Easttom) (explaining that the IPG "shows what's playing on Epix"); *id.* at 157:14-17 (Easttom) & PTX-153 (*Mystic Pizza*).  The evidence likewise showed that an X1 user is never prompted to assign a new channel number to any content source—unlike the '431 Patent, which, for example, "allows the user to program Yuks TV, add it, and they've done it as Channel 900."  4/20 Tr. at 88:22-25 (Cavicchia).[3]

---

[3] These essential steps to adding a channel are also depicted in figure 8 of the patent, which reflects the sole embodiment illustrating this claim limitation and thus should fall within the claim's
(….continued)

There was simply no evidence showing that the X1 system could add a channel that does not already appear in the IPG.  This includes CCTV5—even though Mr. Cavicchia included this *very specific* example in the patent specification.  *See* '431 Patent at 6:19-22.  The claimed invention would allow this addition.  But, the evidence showed, the X1 system does not.  In fact, Dr. Easttom did not even *try* to add CCTV5 to the X1 IPG.  4/20 Tr. at 266:25-267:1.  How can WhereverTV responsibly accuse Comcast of infringement when it did not even try to prove that the X1 system performs according to the claim as described in the specification?

Dr. Easttom actually confirmed that new channels *cannot* be added to the X1 IPG.  As Dr. Easttom explained, when you search for content on the X1 system, the system will "show you every place you can watch it" and provide "a listing of all of them in one single IPG."  4/20 Tr. at 147:25-148:6.  Dr. Easttom testified that Epix and Netflix appear in the IPG whether or not a user has subscriptions to those channels and whether or not the user wants them to appear:  He admitted that "even if [a user] didn't want anything to do with Netflix"—that is, if a user wanted to delete Netflix—"Netflix was there on their IPG."  *Id.* at 272:4-8; *see also, e.g.*, *id.* at 142:3-14, 286:9-16 (same regarding

---

scope.  *See* JTX-001 at 15:14-15 & fig. 8; *see generally Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996) (recognizing that it is "rarely, if ever, correct" to understand a claim to contradict the specification's preferred embodiment).  Although Mr. Cavicchia testified that figure 7 of the patent shows "one way to add a channel in the guide," 4/20 Tr. at 29:11-12, the patent itself is clear that figure 7 does not depict adding a channel and instead shows how to "select[] a specific program on a specific channel."  JTX-001 at 14:27-29.

Epix).  As Dr. Easttom further testified, it is Comcast *and not the user* who decides which channels will be added to or deleted from the X1 IPG.  *See id.* at 271:22-272:3 ("Q.  Okay.  So from 2012 to 2016, if I subscribed to Comcast and I subscribed to Netflix, I couldn't integrate Netflix onto my Comcast IPG.  Comcast wouldn't let me do that, right?  A.  I agree totally.").

Simply put, there was no evidence or example showing that a user could add a linear channel or app to the IPG that was not already in the IPG.  Nor was there any evidence or example showing that a linear channel or app could be deleted from the X1 IPG.  There was no evidence of adding, no evidence of deleting, and thus not sufficient evidence to support a verdict of infringement.

**2.** Rather than attempting to show that Comcast users can "add" or "delete" channels to or from the X1 IPG, WhereverTV adopted the litigation position that *subscribing* to a channel—or *authenticating* an existing subscription—is equivalent to the requisite "adding."  *See* 4/19 Tr. at 198:5-9 (WhereverTV opening) ("Does X1 have the ability to manage subscriptions?  You'll see that it does.").  But WhereverTV has abandoned any reliance on the doctrine of equivalents.  *See* Pl.'s Final Infringement Contentions, May 21, 2021, at 2.  It thus has to prove *literal* infringement—that is, X1 must meet the terms of the "adding or deleting channels" limitation to the letter.

All of the relevant evidence—including the '431 Patent's claims and its specification, along with plain English and common sense—shows that "subscribing" or "authenticating" is not "adding" to the IPG.  Start with the

language of the '431 Patent's claims.  Claim 1 expressly requires "adding or deleting channels."  The words "subscribing" or "authenticating" do not appear in the claim.  Some of the dependent claims, however, *do* refer to the system's ability to manage user rights (*i.e.*, subscription and authentication), and thus authentication cannot mean the same thing as "adding" under the well-established doctrine of claim differentiation, which requires that distinct claims adopt distinct meanings.  *See, e.g.*, *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000).  For example, certain *dependent* claims expressly require "a digital rights management module that obtains viewing rights for at least one of the channels," JTX-001 at 16:60-61 (claim 3), or an IPG that "assists the user in managing rights to receive the streaming video programming," *id.* at 17:67-18:2 (claim 15), or "automatically authenticating the user to one or more of the MSO or non-MSO sources," *id.* at 18:64-66 (claim 26). The "adding or deleting" limitation of every independent claim, including claim 1, cannot be satisfied by authentication or subscription alone or else those claims would be rendered superfluous.

The '431 Patent's specification further confirms it would be unreasonable to conclude that subscribing to a channel that already appears within the IPG adds it to the IPG.  And far from being "random paragraphs from the body of the patent," as Dr. Easttom suggested, 4/20 Tr. at 274:12, the patent's specification bears directly on the meaning of the patent's claims, as the en banc Federal Circuit has recognized.  *See Phillips*, 415 F.3d at 1314.  WhereverTV well knows

that its trial theory is incompatible with the '431 Patent specification, which is why its technical expert testified (incorrectly) that the specification "has nothing [to] do with whether someone infringes or not."  4/20 Tr. at 274:2-3.

The specification affirmatively treats subscribing and authenticating as *different from* adding every time those terms appear together.  For example:

- "And if the user wanted to ***add a new channel <u>or</u> subscribe*** to a specific program, content acquisition and subscriptions can be completed in real-time."  JTX-001 at 6:59-62 (emphasis added).

The specification further confirms that subscribing to a channel is a discrete process from adding it to the IPG and that a user must separately both add *and* subscribe to a channel to watch it.  For example:

- "The user can also manage independent content subscriptions ***and*** add, delete programming channels in 'realtime' that might not be available through subscribed-to MSO's (i.e. a user with a subscription to Time Warner Los Angeles and Comcast Philadelphia might not have access to China's CCTV5 television, but could ***subscribe*** directly with CCTV5 … ***and integrate*** this channel into the IPG."  JTX-001 at 6:16-22 (emphasis added).

And in the specification's description of "the logic undertaken by a user to add a new content source," and its depiction in figure 8, the patent treats "authenticat[ing]" and "digital rights purchas[ing]" (i.e., subscribing) as discrete steps within the process of adding a channel—confirming that those steps are not the entire process.  *Id.* at 15:14-37.

Common sense and dictionary definitions confirm all of this.  *See Phillips*, 415 F.3d at 1314 (recognizing that "general purpose dictionaries may be helpful").  To "add" something to the IPG is to "join … one thing to another … so as to bring

about an increase" and to "delete" it is "to reduce to nullity [or] reject by physically ... excluding."  Webster's Third New Int'l Dictionary 24, 596 (2002). To "subscribe," meanwhile, means "to enter one's name for a publication ... or service," and to "authenticate" means "to make valid and effective."  *Id.* at 146, 2278.  These dictionary definitions confirm what ordinary English speakers know and the '431 Patent specification puts beyond reasonable dispute: subscribing is not adding.[4]

Tellingly, WhereverTV did not offer *any* evidence from the file history, the technical literature, or any other source to show that the plain and ordinary meaning of "adding" includes "subscribing" or "authenticating."  *See generally Phillips*, 415 F.3d at 1317 (discussing potential evidence relevant to the interpretation of claim terms).  To be sure, Mr. Cavicchia himself testified to what he means "when [he] talk[s] about adding a channel."  4/20 Tr. at 30:5-6.  But the inventor's after-the-fact interpretations cannot overcome the meaning of the terms of the patent itself, which provide the requisite public disclosure.  *See, Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983, 985 (Fed. Cir. 1995) (en banc) (The testimony of an inventor "is of little or no probative weight" and "cannot be relied on to change the meaning of the claims."), *aff'd*, 517 U.S. 370 (1996).  Had Mr. Cavicchia wanted to define the terms of the '431 Patent claims to

---

[4] Dr. Easttom's commentary on Dr. Terveen's Epix video (DX204) is not to the contrary.  The references to "added" or "adding" in the video refer to the user's account, not the IPG, and thus do not meet this limitation.  *See* 4/20 Tr. at 289:9-12, 290:16-20.

mean something other than their ordinary meaning (and how the terms are used

throughout the patent), he was obligated to do so clearly within the four corners

of his patent. *See Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1044 (Fed. Cir.

2019). He did not, and he cannot rewrite the patent now.

Now that WhereverTV has rested its infringement case, there is no dispute

that the X1 system does not allow a user to add a channel to the X1 IPG or delete

a channel from it. WhereverTV presented *no evidence* that channels can be

added or deleted. It is undisputed that the X1 system cannot perform the specific

examples of adding channels provided by the specification. No reasonable jury

could conclude, based on the evidence WhereverTV presented in its case-in-chief,

that the X1 system meets the "adding or deleting channels" limitation of claim 1.

### B.    There was not sufficient evidence of an IPG application installed on the X1 set-top box.

Claim 1 also requires "an interactive program guide application installed *on

the device.*" JTX-001 at 16:39-40 (emphasis added). The evidence presented,

however, did not provide a sufficient basis for a reasonable jury to conclude that

the X1 system has an IPG application installed on the set-top box. In addition to

testimony from Mr. Cavicchia and Dr. Easttom, WhereverTV also presented

evidence from two Comcast employees—Ms. Sant and Mr. Robinson—and a

number of technical documents.

WhereverTV's position is that the "XRE Receiver" on the X1 STB satisfies

the "interactive program guide application installed on the device" limitation.

*See* 4/20 Tr. at 129:8-12, 187:11-21, 191:20-23 (Easttom). But no reasonable jury

could conclude that the XRE Receiver on the set-top box meets this claim limitation, since the evidence showed that the XRE Receiver is not itself an IPG application and that the IPG application instead resides elsewhere (on the XRE Server in the cloud).  The evidence showed that XRE Receiver only receives rendering instructions and then works with software on the set-top box to display the relevant screen.  *See* 4/20 Tr. at 193:3-9.

The '431 patent discloses a client-server architecture in which the *IPG application* resides on the device and the *program information* resides on the server; while the X1 platform employs a client-server architecture in which *both* the IPG application *and* the program information reside on servers.  The former proposition is established by the plain language of claim 1:

> an interactive program guide application ***installed on the device*** that provides user-configurable interactive program guide (IPG) … ***and*** descriptive program data ***from the server*** for the video content available on each of the channels

JTX-001 at 16:39-45 (emphasis added).  The latter proposition was conceded by Dr. Easttom, who agreed that "there's an application called XRE guide" and "[t]hat application runs on servers in the cloud, that is, on the XRE server," and "directs the set-top box as to what to display" by "generat[ing] rendering instructions for the XRE receiver."  4/20 Tr. at 278:20-279:5; *see id.* at 283:9-18 (admitting that the "XRE guide application software resides" on the XRE server in the cloud); *cf.* PTX-036 (illustrating this distinction).

The differing goals of the '431 invention and the X1 system explain why this limitation is not met.  A disclosed advantage of the '431 Patent was to give the

*user* control of the IPG for a variety of reasons, including worldwide portability:

> The present invention allows a user to move from location to location and easily acquire, organize and view digital entertainment content from one or more independent content sources (including channel listings, programming information, and saved content) via a "follow me" personalized global IPG that is available on any device that is connected to the Public Internet.

JTX-001 at 6:33-44.  Or, as the specification summarizes, the invention "allows for an always connected, portable set top box, regardless of Internet service provider or MSO." *Id.* at 7:29-30.  In developing the X1 system, Comcast went entirely in the other direction—taking the IPG application *off* the set-top box (as in prior systems) and moving it to the cloud.  This was, according to Dr. Easttom, "a major part" of why Comcast developed the X1 system.  *See* 4/20 Tr. at 279:22-280:8.  The XRE Receiver is not an IPG application; it is only a "thin client" located on the set-top box that renders the information as directed by the guide application (among other applications) on the XRE Server (which concededly does not satisfy the "installed on" limitation).  4/21 Tr. at 48:5-9 (Sant).

> Dr. Easttom testified that the XRE receiver performs two functions:

> The first is it literally draws that IPG on the screen pixel by pixel. Second, if you click your remote control, whatever you click gets sent to the XRE receiver, then processes it, packages it up as data, and sends it back to the XRE server to perhaps retrieve data or whatever it is your click indicates.

4/20 Tr. at 133:16-21 (Easttom); *see also id.* at 184:1-5 (Easttom) ("[I]t actually draws what you see on the screen pixel by pixel. It also takes whatever input you give it through the remote control and creates one of these events and sends it to the server side. Then the server may send back data.").  The Comcast technical

documents introduced by WhereverTV, along with the testimony of Comcast employees, confirmed that the XRE Receiver performs these two functions. *See* 4/21 Tr. at 15:2-21:4, 47:2-56:23, 61:9-16, 67:18-68:14, 86:23-91:18 (Sant); *id.* at 113:11-132:19 (Robinson).  But this evidence did not establish that the XRE Receiver performs any other functions, including (critically) any IPG application functions, let alone the user configuration required by the claim.

These two functions do not an IPG application make.  Drawing ("rendering," in computer parlance) means that the XRE Receiver instructs the display to show the IPG information transmitted from the XRE Server, but the IPG functionality itself is provided by the guide application residing on the XRE Server.  And the XRE Receiver transmits data to, and receives data from, the XRE Server; but it is the XRE Server that processes the data, including any user-configurable options in the guide.  *Cf.* 4/20 Tr. at 206:12-18 (Easttom) (testifying that the X1 IPG can be configured by the user with respect to layout, color, favorite channels, and parental controls).  As a result, the XRE Receiver does not meet the claim requirement that the IPG application be installed on the device.

Because the evidence showed that the X1 IPG application—expressly called the guide application—resides on servers rather than the STB (the accused "device"), no reasonable jury could find that Claim 1's requirement of an IPG application "installed on the device" is met.

## IV.  WHEREVERTV DID NOT PRESENT LEGALLY SUFFICIENT EVIDENCE OF APPORTIONMENT.

The trial evidence is not sufficient to support any award of damages to

WhereverTV, because (among many other problems) WhereverTV failed to adequately apportion its "reasonable royalty" requests. Where, as here, the accused product includes components or features that are not alleged to infringe, the plaintiff's burden to prove damages includes apportioning any proposed royalty so that it reflects "the value attributable to the infringing features of the product, and no more." *Ericsson*, 773 F.3d at 1226-27.

WhereverTV's damages expert, Kyle Elam, recognized that "apportionment is all about" "differentiat[ing] between the value of [unpatented] features and the value of the patented information." 4/24 Tr. at 10:12:23-34 AM. Yet none of Mr. Elam's four different apportionment approaches provides legally sufficient evidence to allow the jury to "apportion the ... patentee's damages between the patented feature and the unpatented features" using "reliable and tangible" evidence admitted at trial. *Garretson*, 111 U.S. at 121. Comcast challenged Mr. Elam's damages calculations at the *Daubert* stage, *see* Doc. No. 285 at 18-32 (Court order denying Comcast's motion), and renewed its objection to all four of Elam's approaches for apportioning damages in advance of his testimony, *see* 4/21 Tr. at 160:6-161:5. Comcast's position is (and remains) that none of Elam's apportionment testimony should have been admitted; and, without such evidence, there is no basis for an award of damages in this case.

**1.** Mr. Elam's first apportionment method multiplied the proportion of X1 subscribers in 2017 who used Netflix (33 percent) by the proportion of customers who wanted a "universal listing" for multiple content sources (62 percent). *See*

4/21 Tr. at 217:16-218:5.  According to Mr. Elam, this figure—about 20 percent—is the "percent of Comcast current customers [that] are going to use the patented features."  *Id.* at 217:24-25.  And thus, Mr. Elam opined, the patented features account for 20 percent of the implied value of the STB's X1 functionality.

The critical final step in Mr. Elam's estimate is fatally flawed.  He offered no testimony whatsoever to analyze the relationship between the two populations—X1 subscribers who use Netflix and customers who want a universal listing.  It might be the case that the populations are entirely discrete, meaning that there are no X1 customers who want both features.  Or there might be some overlap, but perhaps far less than 20 percent.  Without any analysis of the relationship, the jury cannot reasonably accept the 20 percent estimate. Moreover, Mr. Elam's estimate necessarily assumes that these 20% of X1 subscribers care *only* about these particular features and ascribe zero value to the many other benefits X1 provides.  This assumption, too, is unreasonable, given the many valuable features of the X1 system that are not infringing, as Dr. Easttom testified.  *See* 4/20 Tr. at 239:4-8.  Finally, even were it reasonable to assume that 20% of X1 subscribers care solely about the patented features, this still does not provide a basis for concluding that 20% of the STBs' implied value (which itself is an unsupported royalty base) is attributable to the patented invention.  Mr. Elam offered no evidence indicating that subscriber use of Netflix (or preference for universal listings) has anything to do with value.

The Federal Circuit has been clear about the type and quantum of evidence

required to support the style of apportionment Mr. Elam offers—and it makes clear that Mr. Elam's testimony is lacking.  *See, e.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1378 (Fed. Cir. 2021) (holding that a patentee "failed to present sufficient evidence" that the patented feature accounted for the identified demand for the product where it "point[ed] to lesser testimony, for example, that [the patented feature] would be 'an important feature' or 'a helpful feature'" and where the "[products] would still have value absent this feature" (citations omitted)).

**2.** Mr. Elam's second method of apportionment relies on Dr. Easttom's conclusion that 30% of the top-level components of the X1 system are "implicated" in infringement.  4/20 Tr. at 249:4-13 (Easttom); 4/21 Tr. at 228:7-19 (Elam).  While Dr. Easttom's "counting components" testimony is in the evidentiary record, it does not establish "the value attributable to the infringing features of the product, and no more."  *Ericsson*, 773 F.3d at 1226-27.

Mr. Elam provided *no* analysis of how the components counted by Dr. Easttom add *value* to X1.  Rather, he simply averaged the weights provided by Dr. Easttom and applied that average (30%) to his royalty base.  Because he did not even purport to take into account the economic contribution of the patented functionality to the X1 platform, it provides no basis for apportioning damages. And no reasonable expert (or reliable expert methodology) would use component counting in this way.

To be admissible, expert testimony that apportions by counting or

weighing infringing components must show that the analysis reflects the economic value of the alleged invention to the product of which it is a part. *Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*, No. 12-cv-1013-RGA, 2015 WL 410342, at *2-3 (D. Del. Jan. 29, 2015), *aff'd sub nom. Sprint Commc'ns Co. v. Comcast Cable Commc'ns, LLC*, 675 F. App'x 974 (Fed. Cir. 2017); *Cal. Inst. of Tech. v. Broadcom Ltd.*, No. 16-cv-3714-GW (AGRX), 2019 WL 8807926, at *9-11 (C.D. Cal. Nov. 21, 2019).  A damages expert must employ a "methodology that can be relied upon for determining how the patented features add value." *Sprint*, 2015 WL 410342, at *3.

**3.** Mr. Elam's third apportionment method estimates that Comcast would have claimed 74% of the estimated royalty base—which equals Comcast's net cash flow margin on leased set-top boxes—leaving WhereverTV with the remaining 26%.  He applies this estimate both to his own calculations of the infringed features' value and then separately uses the same percentage to isolate the value of the '431 Patent from the total value of Comcast's incremental OTT revenue. *See* 4/21 Tr. at 230:24-231:5, 247:20-248:5.  There is no reasonable basis for the jury to apply this apportionment factor to either number—much less both.

Net cash flow reflects the proportion of revenue that remains after *all* liabilities have been subtracted—not any amount that reflects the use of the invention itself or analogous inventions.  Or, put another way, the 26% Mr. Elam would assign to WhereverTV is a measure of *all* of Comcast's costs and other liabilities as a percentage of its revenue, not just the portion that goes to the use

of patented technologies.  Nothing in the calculation of that 26% reflects any attribution of value to the infringing features and nothing in the evidence showed that a "cash flow margin" is a reasonable proxy for the apportionment of damages to reflect the value of only the '431 patent.  The mere 13 transcript lines Mr. Elam devotes to explaining his use of this metric to apportion Comcast's OTT income fails to justify applying a financial metric relating to set-top boxes to a royalty base involving nothing of the sort—much less does it connect that metric to the value of the infringing features.  *See* 4/21 Tr. at 247:22-248:9.

Courts routinely reject similar efforts to apportion damages based on generalized financial metrics disconnected from the value of the patent-in-suit. *See, e.g.*, *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2022 WL 2670163, at *4 (N.D. Cal. Jan. 12, 2022) ("Neither Nordstrom's gross profits on all of its products nor its costs of acquiring an additional customer are reliable indicators of what it would spend to use Droplets's technology."); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 5956325, at *15 (E.D. Mich. Oct. 14, 2016).

**4.** Mr. Elam's fourth apportionment method—supposedly based on costs of capital—likewise was not supported by sufficient evidence.  *See* 4/21 Tr. at 248:10-249:12.  Mr. Elam took Comcast's software and intangible costs as a percentage of X1 capital costs—and calculated an apportionment figure slightly more than 25%—rather than looking at Comcast's total costs.  But by excluding relevant costs from the denominator of his calculation, Mr. Elam vastly

overstated the value attributable to the '431 Patent.

At bottom, Mr. Elam's various apportionment methods—which all value of the patented features at 20-30% of the estimated royalty base—appear to be an improper attempt to revive the "25 percent rule of thumb" that the Federal Circuit rejected as "fundamentally flawed" because it "fails to tie a reasonable royalty base to the facts of the case at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Mr. Elam's apportionment approaches are no way connected to the value of the '431 Patent itself. They certainly do not account for only the value of the allegedly infringing aspects of the X1 system relative to the X1 system's other unpatented features. All of Elam's estimates are thus "unjustified by evidence about the particular facts" and cannot suffice to "apportion the royalty [base] down to a reasonable estimate of the value of [the] claimed technology." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329, 1333 (Fed. Cir. 2014).

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Comcast judgment as a matter of law.

Dated: April 25, 2023

Of Counsel:
DAVIS POLK & WARDWELL LLP
Ashok Ramani
ashok.ramani@davispolk.com
David J. Lisson
david.lisson@davispolk.com
Serge A. Voronov
serge.voronov@davispolk.com
1600 El Camino Real
Menlo Park, CA 94025
Tel:  (650) 752-2000

Kathryn Bi
kathryn.bi@davispolk.com
Alena Farber
alena.farber@davispolk.com
450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000

Respectfully submitted,

*/s/ Traci T. McKee*

FAEGRE DRINKER BIDDLE & REATH LLP
Traci T. McKee
Florida Bar No. 53088
traci.mckee@faegredrinker.com
1050 K Street NW, Suite 400
Washington, DC 20001
Tel:  (202) 312-7028
Fax:  (202) 312-7460

26

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 25, 2023, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to all counsel of record.

*/s/ Traci T. McKee*

Traci T. McKee
