**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

WHEREVERTV, INC.,

      Plaintiff,

v.                                     Case No: 2:18-cv-529-WFJ-NPM

COMCAST CABLE
COMMUNICATIONS, LLC,

      Defendant.

_____/

## **ORDER**

On April 26, 2023, following the parties' presentation of evidence during a six-day jury trial, the Court granted Defendant Comcast Cable Communications, LLC's ("Comcast") Rule 50(a) Motion for Judgment as a Matter of Law, Dkt. 409. *See* Dkt. 414. At the Court's invitation, Plaintiff WhereverTV, Inc. ("WTV") and Comcast filed supplemental briefs on the Court's ruling. Dkts. 428 & 429. Both parties also submitted rebuttal briefs. Dkts. 430 & 431. Upon careful consideration and in accordance with its earlier ruling, the Court directs final judgment to be entered in favor of Comcast and against WTV.

## **BACKGROUND**

Founded in 2006, WTV is a "television service provider that offers live-streaming video content to subscribing customers around the world and through a

wide range of internet enabled devices." Dkt. 30 ¶ 11. WTV is the assignee and owner of the '431 Patent, which was issued by the United States Patent and Trademark Office ("USPTO") in February 2014. Dkt. 418-1. The '431 Patent discloses "[a] system and device . . . that employs a global interactive program guide ['IPG'] to receive, access, manage, and view digital entertainment services such as live television, television on demand, and pre-recorded video and audio programming from one or more content sources, via an internet-enabled device, anywhere in the world." *Id.* at 1. The '431 Patent states that "[t]he goal is to shift control of content availability, organization, and access from MSO's [multi system operators], which is today's cable television model, to a new user-centric model where the user can choose whether or not to purchase content from a content consolidator or directly from independent content providers." *Id.* at 15.

In 2009, cable television and internet provider Comcast began developing an entertainment platform known as the Xfinity X1 (the "X1"). Dkt. 30 ¶ 24; Dkt. 420 at 122. The X1 allows users to access video content from their cable provider and streaming providers through a "cloud-based system." *See, e.g.*, Dkt. 420 at 118−20, 136. Among other components, the X1 is comprised of the XRE[1] receiver, which is

---

[1] The acronym "XRE" stands for Xcalibur rendered engineering, with "Xcalibur" being Comcast's initial internal name for the Xfinity project. *See* Dkt. 420 at 121, 129.

located on the X1 set-top box, and the cloud-based XRE server. *See* Dkt. 417-3 at 9.

In 2018, WTV filed the instant action against Comcast, claiming that Comcast "directly infringed and continues to directly infringe all the claims of the '431 Patent . . . by making, using, offering for sale, and selling the Xfinity X1 Platform." Dkt. 30 ¶¶ 47–48. Claim 1, the independent claim that remains the sole issue in the case, reads in full:

> 1. a content manager device comprising:
>
> a server resident on a network containing descriptive program data about video content available from one or more multiple cable system operators (MSOs) and one or more non-MSOs;
>
> a device capable of establishing and maintaining a connection with the network via communications link; and
>
> an interactive program guide application installed on the device that provides user-configurable interactive program guide (IPG) listing at least one channel of video content available from each of the one or more MSOs and descriptive program data from the server for the video content available on each of the channels, wherein each of the channels is selectable for receiving only or virtually entirely streaming video programming from its respective MSO or non-MSO source via the communications link and the network; wherein the server is distinct from at least one of the one or more MSOs and one or more non-MSOs, and wherein the application allows for the IPG to be configured by a user with respect to adding or deleting channels from any of the one or more MSOs or the one or more non-MSOs.

Dkt. 418-1 at 20.

Following a Markman hearing in 2020, Chief Judge Timothy Corrigan

issued a claim construction order on seven disputed terms within Claim 1 and other dependent claims. Dkt. 172. Finding further construction necessary for only two of those seven terms, Judge Corrigan construed "multiple cable system operators (MSOs)" to mean "a cable, satellite, or Internet television content consolidator that receives and then broadcasts channels of video content" and "non-MSOs" to mean "a video content provider that does not act like an MSO because it does not receive and then broadcast channels of video content." *Id.* at 5. Relevant to this Order, Judge Corrigan declined to construe the terms "independent program guide" and "adding or deleting channels from any of the one of more MSOs or the one or more non-MSOs." *Id.* at 8–9. The case was thereafter transferred to Judge Badalamenti, who held a second Markman hearing and adopted Judge Corrigan's pertinent constructions. Dkt. 302 at 15. After several amendments to the parties' case management and scheduling order, the case was set for a March 2023 jury trial. *See* Dkt. 326.

One week before the scheduled trial, the trial was continued, Dkt. 365, and the case was transferred to the undersigned, Dkt. 374. A jury trial before the undersigned subsequently commenced on April 19, 2023. By that time, the parties had narrowed the case to the WTV's claim of literal infringement of Claim 1 of the '431 Patent. At the close of WTV's case, Comcast moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), asserting a lack of sufficient

evidence showing that the X1 meets Claim 1's "adding or deleting channels" limitation or "interactive program guide application installed on the device" limitation. Dkt. 409. The Court took oral argument on Comcast's motion outside the presence of the jury following the parties' closing arguments on the sixth day of trial. Dkt. 424 at 127−55. Finding that no reasonable jury could find direct infringement of the "adding or deleting channels" or the "interactive program guide application installed on the device" limitations, the Court granted Comcast judgment as a matter of law. *Id.* at 155−56. This final Order follows.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 50(a), a "district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for [plaintiff] on a material element of [plaintiff's] cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) (citations omitted). Accordingly, a court should grant a Rule 50(a) motion "only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). In deciding a Rule 50(a) motion, a court must view all evidence and draw all reasonable inferences in the non-moving party's favor. *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).

## ANALYSIS

In moving for judgment as a matter of law, Comcast asserts that WTV failed to present sufficient evidence for a reasonable jury to conclude that the X1 meets each and every limitation of Claim 1. Specifically, Comcast avers that no reasonable jury could find that the X1 meets either the "adding or deleting channels" limitation or the "interactive program guide application installed on the device" limitation.

Because WTV is arguing that the X1 "literally infringed" the '431 Patent, WTV has the burden of proving by a preponderance of the evidence that the X1 literally embodies every limitation of Claim 1. *See Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369 (Fed. Cir. 2009); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1302 (Fed. Cir. 2001) ("Literal infringement requires a patentee to prove by a preponderance of the evidence that every limitation of the asserted claim is literally met."). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d at 1247.

The Court notes that literal infringement is distinct from infringement under the doctrine of equivalents, which "requires that the accused product contain each limitation of the claim *or its equivalent.*" *See Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1359 (Fed. Cir. 2000) (emphasis added). Unlike the doctrine of

6

equivalents, which dictates that infringement can be found so long as the differences between the accused product and a claim element are "insubstantial" to one of ordinary skill in the art, *see Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997), literal infringement requires more exactitude, *see Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly.").

A literal infringement analysis involves two steps. "First, the asserted claims must be interpreted by the court as a matter of law to determine their meaning and scope. In the second step, the trier of fact determines whether the claims as thus construed read on the accused product." *Id.* (internal citations omitted). The Court considers the sufficiency of WTV's evidence[2] with respect to the two disputed limitations in turn.

## I. "Adding or Deleting Channels" Limitation

Relevant to the "adding or deleting channels" limitation, Claim 1 states that "the application allows for the IPG to be configured by a user with respect to adding or deleting channels from any of the one or more MSOs or the one or more

---

[2] The evidence was closed on April 27, 2023, at the conclusion of trial. In connection with its supplemental, post-trial brief on this matter, WTV filed fourteen exhibits—including a new declaration from its expert—on the docket eighteen days after the close of evidence and this Court's ruling. *See* Dkt. 428 (exhibits). Untimely evidence will not be considered.

non-MSOs." Dkt. 30-1 at 19. WTV's infringement argument hinges on its understanding of "adding or deleting."

At trial, WTV argued that an X1 user who subscribes (or unsubscribes) to a particular channel offered by Comcast on X1 has added (or deleted) that channel within the meaning of those terms as used in Claim 1. *See, e.g.*, Dkt. 419 at 198. For example, WTV explained in its opening argument that, with the X1, "[y]ou can add and delete channels. You can manage subscriptions right there through the X1 guide. . . . If you want to add the Starz channel, Showtime channel, Cinemax channel, Movie channel, Netflix channel, you can add any of them." *Id.* Thus, WTV contends that the X1 infringes Claim 1 because a user managing subscriptions to channels is akin to a user adding or deleting channels.

However, because WTV abandoned its infringement claims under the doctrine of equivalents, WTV cannot prevail merely by showing that "subscribing" to a channel is substantially the same as, or similar to, adding a channel to the IPG. WTV must instead show by a preponderance of the evidence that subscribing is literally "adding" and that unsubscribing is literally "deleting." This means that the X1 cannot be said to literally infringe the "adding or deleting channels" limitation unless a user can, in fact, add or delete a channel from the IPG.

After reviewing the evidence presented at trial, the Court finds that WTV did not meet its burden of proof as to this literal infringement argument. Specifically,

8

WTV did not introduce sufficient evidence at trial for a reasonable juror to conclude that the X1's IPG can "be configured by a user with respect to adding or deleting channels." Thus, as the Court explains below, WTV has failed to establish literal infringement.

**A.    Because the Court declined to construe the "adding or deleting" channels limitation, the Court interprets the term according to its plain and ordinary meaning.**

The Court twice engaged in claim construction in this case, and both times it declined to construe the adding or deleting channels limitation. Dkt. 172 at 8-9; Dkt. 302 at 15. WTV stated that the Court should use the plain and ordinary meaning of "adding or deleting." *See* Dkt. 172 at 8−9. On two separate occasions WTV had the opportunity to move the Court to construe "adding or deleting channels" in a manner that would explicitly accommodate "subscribing and unsubscribing." *Id.*; *see also* Dkt. 302 at 15. WTV did not do so on either occasion. Nor did either party move to have the "adding or deleting channels limitation" construed during trial.[3]

The Federal Circuit has repeatedly held that a district court is not obligated to construe terms with ordinary meanings. *See*, *e.g.*, *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed.

---

[3] The Court notes that Comcast orally requested after the close of evidence that "if the Court is inclined to submit the issue to the jury, as we're aware courts often do, we object to the failure to construct and request that the term be construed." Dkt. 424 at 134.

Cir. 2001) (finding no error in non-construction of "melting"); *Mentor H/S, Inc. v. Med. Device All., Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in court's refusal to construe "irrigating" and "frictional heat"). Generally, there is a "heavy presumption in favor of the ordinary meaning of claim language." *See Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). And where a district court determines that a claim term does not require further construction, that term receives its plain and ordinary meaning as understood by a person of skill in the art. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.*; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("We agree with this construction of the claim, for it is the plain reading of the claim text. These are not technical terms of art, and do not require elaborate interpretation.").

Here, "adding" and "deleting" are not used idiosyncratically and do not have discrete, technical meanings within the field of art, as WTV noted. *See* Dkt. 172 at 8−9. The prior judges' decisions to not further construe "adding or deleting" was therefore in accord with the significance of these terms and the role that these terms play within the context of Claim 1 of the '431 Patent. As such, these terms

will receive their plain and ordinary meaning. *See Phillips*, 415 F.3d at 1312

("Because the patentee is required to define precisely what his invention is . . . it is

unjust to the public, as well as an evasion of the law, to construe it in a manner

different from the plain import of its terms.").

To determine the plain and ordinary meaning of a claim term, courts may

look to general purpose dictionaries. *See id.* at 1314. Merriam-Webster's

Dictionary defines "add" as "to join or unite so as to bring about an increase or

improvement" and "delete" as "to eliminate especially by blotting out, cutting out,

or erasing." *Add*, *Merriam-Webster Dictionary*, https://www.merriam-

webster.com/dictionary/add (last visited May 31, 2023); *Delete*, *Merriam-Webster*

*Dictionary*, https://www.merriam-webster.com/dictionary/delete (last visited May

31, 2023). The Oxford English Dictionary defines "add" as "[t]o join (something)

to something else so as to increase the amount, size, importance, etc.; to put in as

an additional element or ingredient" and "delete" as, among other things, "[t]o

remove (a character, a selection of text or string of characters, or piece of other

data) from an electronic document or a program's interface" or "[t]o remove (a

file) from the memory of a computer or (in later use) electronic device, computer

network, etc. Also: to uninstall (a program or application)." *Add*, *Oxford English*

*Dictionary*,  https://www.oed.com/view/Entry/2155?rskey=hrC8Nv&result=2#eid

(last visited May 31, 2023); *Delete*, *Oxford English Dictionary*,

https://www.oed.com/view/Entry/49325?rskey=cQCvpb&result=2&isAdvanced=f alse#eid (last visited May 31, 2023).

While dictionary definitions alone are not controlling as to the plain and ordinary meaning of a particular claim term, they are "useful to assist in understanding the commonly understood meaning of words" where, as here, there is no competing art-specific evidence of meaning. *See Phillips*, 415 F.3d at 1322. The Court therefore reiterates the earlier claim construction order determining that "adding or deleting channels" is afforded its plain meaning. No further claim construction is required as commonsense, ordinary understandings of "adding" and "deleting" are confirmed by the above referenced dictionary definitions, and the parties have introduced no evidence tending to yield more than one "ordinary" meaning for these terms. Nor did WTV request the same.

## B. Channels cannot be added or deleted on the X1 under the plain meaning of "add" and "delete," meaning the X1 does not literally infringe Claim 1.

The second step in the literal infringement analysis asks, "whether the claims as thus construed read on the accused product." *Southwall Techs.*, 54 F.3d at 1575. As explained below, WTV did not introduce any evidence at trial that X1 users can add or delete channels in a manner that accords with the plain and ordinary meaning of those terms. WTV therefore failed to show by a

preponderance of the evidence that the X1 literally infringes the "adding or deleting channels" limitation of Claim 1.

WTV premised its infringement argument on its contention that a user "managing subscriptions" is the same as that user "adding or deleting channels." Dkt. 419 at 198. WTV first made this argument in its claim construction briefing asserting that "[a]dding a channel refers to 'integrating' the channel into the IPG. One way to add a channel to the IPG is to subscribe to the channel." Dkt. 96 at 25. At the first Markman hearing, however, the previously assigned judge expressed skepticism as to this syllogism, asking, "Why would you add to the guide something that's already there, and why would you delete from the guide something that's going to be there after you delete it? I don't get it." Dkt. 165 at 132. That concern highlights the issue with respect to WTV's infringement argument on this particular limitation.

To begin, in attempting to elide plain English and get the jury to adopt its narrow and idiosyncratic reading of "adding or deleting," WTV improperly contorted the Court's instruction as to the scope of the limitation. At no point during trial did WTV introduce evidence that an X1 user could subscribe to a channel that was not already offered on the accused X1's IPG, thereby increasing the number of channels offered on the IPG. Nor did WTV introduce any evidence that a user who unsubscribed from a particular app—such as Netflix—could

remove that app from the X1's IPG entirely such that search results for content contained in that app would not appear or that the app would not be displayed on the IPG. Thus, by encouraging the jury to accept that subscribing is adding and unsubscribing is deleting, WTV encouraged a departure from the plain and ordinary meaning of these terms.

Even if WTV could argue that subscribing is like adding, under the plain and ordinary meaning of adding, mere equivalence is not enough to satisfy literal infringement. Again, to argue literal infringement, WTV must state that subscribing *is* adding and unsubscribing *is* deleting. WTV may not assert literal infringement based on the theory that unsubscribing from an app—so as to restrict that app's content by "graying it out" or placing it behind a paywall or a request for credentials—is conceptually similar to deleting that app simply because both actions create impediments for the user who wants to watch content offered by the app. WTV must show that an X1 user can actually delete the app from the IPG. WTV, however, has introduced no evidence that this is possible, and in fact, its witnesses confirmed just the opposite. One cannot delete a channel from the X1. Nor can one add a channel that Comcast did not deign to include. WTV's case in chief failed to prove that the X1 user can add or delete channels.

In its case in chief, WTV called Jessica Sant, who leads the team that builds the X1 user interface at Comcast, to testify. Dkt. 421 at 79. When asked how a user

14

can add or delete apps from the IPG on the X1, Ms. Sant stated, "[i]t's not possible. All the apps that are available to a customer are listed here. There's no way for a customer to add an app or remove it." *Id.* at 80. Ms. Sant elaborated that a user could not add or delete an app because "[t]hat's simply not how the system was designed. All the channels that are available to a customer are present in the guide, in the IPG, whether or not they are subscribed to them." *Id.* In sum, Ms. Sant testified that subscribing to or authenticating a channel cannot be "adding" that channel to the X1 IPG because, irrespective of the user's actions, the channel—including its content and metadata—will be present on the IPG. That is, "[t]he rows that exist are all there[.] There's no way to add or remove them." *Id.*

WTV's technology expert, Dr. William C. Easttom II, confirmed this fact. Dr. Easttom testified that new channels cannot be added to the X1 IPG because when a user searches for content on the X1 system, the system will "show you every place you can watch it" and provide "a listing of all of them in one single IPG." Dkt. 420 at 148. Thus, when a user searches for particular content on the X1, the results yielded by the X1 will include every channel containing that content, irrespective of whether the user is subscribed to the channel. *Id.* As Dr. Easttom testified, even if a user did not want the Netflix app on her X1's IPG and had no intention of ever subscribing to Netflix, the Netflix app would still appear, and the user would not be able to delete it. *Id.* at 277. In this regard, Dr. Easttom

15

essentially conceded that the user cannot "configure the IPG with respect to adding or deleting channels," as Claim 1 requires given that, irrespective of the user's personal preferences as to what channels appear on the IPG, all channels offered by Comcast would still be displayed on the IPG. *See id.*

Ms. Sant and Dr. Easttom's testimony regarding the rigidity of the X1's IPG display and the immutability of the channel listings provided by Comcast is in no way identical to the customizable and restriction-free invention described in the '431 Patent's specification. That specification explains in relevant part:

> The present invention allows a user to move from location to location and easily acquire, organize and view digital entertainment content from one or more independent content sources (including channel listings, programming information, and saved content) via a "follow me" personalized global IPG that is available on any device that is connected to the Public Internet. The goal is to shift the control of content availability, organization, and access from MSO's, which is today's cable television model, to a new user-centric model where the user can choose whether or not to purchase content from a content consolidator or directly from independent content providers.

Dkt. 30-1 at 14. Users of the X1 cannot "easily acquire . . . content," and they have no "control of content availability" because, as Ms. Sant testified, the X1 does not allow users to pick and choose whatever channels they want on their devices. *See* Dkt. 421 at 92 (Ms. Sant explaining, "One of the reasons that we designed it that way is so that Comcast can really control what content is available to our customers so we can provide a really high-quality experience so there's not any rogue content on the system."). Simply put, the role that "adding or deleting

16

channels" plays in the '431 Patent's efforts to permit users to pick and choose what content is available to them, wherever they are in the world, is totally dissimilar to the role that "managing subscriptions" plays on the X1. While the '431 Patent allows users to increase the number of channels available to them—true to the plain and ordinary meaning of "adding"—the X1 only allows users to log in and out of channels that Comcast, and *only* Comcast, chose irrevocably to emplace on the IPG.

In sum, WTV has not shown that a user's ability to manage subscriptions on the X1 literally embodies a user's ability to add or delete channels as described in Claim 1. Instead, the evidence introduced by WTV at trial highlights the marked dissimilarities between the '431 Patent and the X1, particularly vis-à-vis what the inventor described as the "goal" of the invention—to allow a user to exercise full, unrestricted dominion over the content available to her on the IPG. *See* Dkt. 30-1 at 14. For these reasons, the Court finds that no reasonable juror could find that WTV has shown by a preponderance of the evidence that the X1 literally infringes the "adding or deleting channels" limitation of Claim 1.

## II.   "Interactive Program Guide Application Installed on the Device" Limitation

Turning to the second disputed limitation, Claim 1 also calls for an "interactive program guide application installed on the device[.]" Dkt. 418-1 at 20. At trial, WTV maintained that the X1 meets this limitation because the XRE

17

receiver, which the parties agree is installed on the X1 set-top box (i.e., "the device"), is an IPG application. However, no reasonable jury could make this finding based upon the evidence presented at trial. As set forth below, there is insufficient evidence to support a finding of literal infringement.

### A. Because the Court declined to construe the "interactive program guide application installed on the device" limitation, the term is afforded its plain and ordinary meaning.

As with the "adding or deleting channels" term, the Court previously declined to further construe "interactive program guide" or "interactive program guide application" during either claim construction. Dkt. 172 at 8; Dkt. 302. WTV suggested that this term should have a "plain and ordinary meaning, namely a program guide that enables user interaction." Dkt. 172 at 8. Accordingly, the term "interactive program guide application" receives its plain and ordinary meaning as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312−13. Notably, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent[.]" *Id.* at 1313.

Where, as here, a term's plain and ordinary meaning is not readily apparent, courts look to "those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean,"

including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum."). It is with this understanding that the Court considers whether WTV offered sufficient evidence to show literal infringement of the "interactive program guide application installed on the device" limitation.

**B.    The X1 does not literally infringe Claim 1 because the X1 does not have an "interactive guide application program installed on the device."**

When considering the meaning of an "interactive program guide application" as understood by a person of ordinary skill in the art, it is apparent that WTV failed to present sufficient evidence to show that the X1 has an "interactive program guide application installed on the device." WTV therefore failed to carry its burden to show that the X1 literally infringed this limitation.

Turning first to the claim language, Claim 1 requires "an interactive program guide application *installed on the device* that provides user-configurable interactive program guide (IPG) listing at least one channel of video content . . . and descriptive program data from the server for the video content available on each of

19

the channels." Dkt. 418-1 at 20 (emphasis added). This language plainly describes a client-server architecture in which the interactive program guide application is installed on the device, i.e., the set-top box, and descriptive program data resides on a server. Though Dr. Easttom asserted that the X1 utilizes this architecture, *see* Dkt. 420 at 135−36, it is undisputed that the X1 has an "XRE guide" application that exists and runs not on the X1 set-top box. Rather, the XRE guide is installed and runs "on servers in the cloud"—namely, the XRE server. *Id.* at 284. Dr. Easttom acknowledged that it is this XRE guide application that "directs the set-top box as to what to display" and "generates rendering instruction for the XRE receiver" with respect to the IPG. *Id.* at 284. Therefore, the uncontested evidence shows that the interactive program guide application is not installed on the device (the set-top box).

Despite the undisputed existence that the "XRE guide application" in the cloud provides all the data assembly and "brains" necessary for the interactive program guide, WTV maintained throughout trial that the XRE receiver on the set-top box is the X1's IPG application. However, the '431 Patent's specification does not support this conclusion. Figure 8[4] in the '431 Patent depicts an IPG application that, among other things, "procures digital rights via stored profile," "locates and

---

[4] WTV specifically directed the Court to Figures 7 and 8 of the '431 Patent in arguing its opposition to the instant motion. Dkt. 424 at 139−40, 150−52.

authenticates" new content sources, and "downloads and synchronizes content metadata from new content sources." Dkt. 418-1 at 12. Indeed, counsel for WTV conceded that Figure 8 is, "in a sense," a helpful illustration to understand the functions of an interactive program guide application. Dkt. 424 at 153. Moreover, Figure 4 within the '431 Patent serves as "a conceptual architectural diagram of the global IPG application." Dkt. 418-1 at 16. Figure 4 depicts the invention's IPG application as having "Core Application Features" such as data integration, user authentication, and customization and personalization of the IPG, as well as "Core Application Functions" like content subscription management, content organization management, and user profile management. *Id.* at 8, 18.

WTV presented no evidence that the XRE receiver in the X1 set-top box "device" offers any of the functions or features illustrated in Figures 4 or 8. Instead, Dr. Easttom testified that the XRE receiver is a "thin client"[5] capable of performing only two major functions: "draw[ing] what you see on the screen pixel by pixel" and sending "whatever input you give it through the remote control" to the cloud-based XRE server, "which may send data back." Dkt. 420 at 189, 285. In other words, at best WTV proved the accused device (the X1 set-top box) is a thin client, signaling device, and WTV never showed that the interactive program guide

---

[5] In computing parlance, a "thin client" is a system with limited processing power, whereas a "fat client" is a system with greater processing power. *See* Dkt. 420 at 284−85; Dkt. 423 at 58.

application was installed therein. This was confirmed by WTV's counsel, who described the XRE receiver as a "graphics program." Dkt. 424 at 148−49. How a "graphics program" constitutes an "interactive program guide application" was never made clear.

Moreover, both parties' experts agreed that Comcast intentionally designed the X1 set-top boxes to work as thin clients that do not execute application logic.[6] Dkt. 423 at 58 (Dr. Terveen); Dkt. 420 at 201−02, 285 (Dr. Easttom). Dr. Terveen explained that, while placing IPG applications on set-top boxes "was really the way things worked in the industry" at the time of the '431 Patent application in 2006, Comcast chose to depart from "the old way of doing things" by placing the X1's IPG application on a cloud-based server that executes all application logic. Dkt. 423 at 45−46, 58. Dr. Terveen testified without contradiction that Comcast made this decision because a server has "a lot more computational power than a set-top box," and Comcast could update the IPG application on the server instead of requiring customers to download updated versions onto their set-top boxes. *Id.* at 47; *see also* Dkt. 420 at 202, 283−84 (Dr. Easttom similarly testifying that Comcast does not "have to change the receiver every single time something changes in [the] back end" because the application logic is executed on the XRE

---

[6] The parties' experts described this "application logic" as how the IPG application processes user inputs, such as remote key presses, "behind the front end." *See* Dkt. 420 at 201; Dkt. 423 at 58.

server). Due to this design choice, it is undisputed that the cloud-based XRE server, and *not* the XRE receiver, provides "the data necessary for the . . . IPG." Dkt. 420 at 189 (Dr. Easttom).

Ultimately, while the XRE receiver in the X1 set-top box may be an "application installed on the device," WTV failed to sufficiently demonstrate that the XRE receiver constitutes an "*interactive program guide* application installed on the device" as understood by a person of ordinary skill in the art. This is particularly evident in light of the language of Claim 1, the '431 Patent specification, and relevant proof at trial. With insufficient evidence for a reasonable jury to find that the X1 meets the "interactive program guide application installed on the device" limitation, WTV cannot show the X1's literal infringement of Claim 1 of the '431 Patent.

## CONCLUSION

Based on the foregoing, Comcast is entitled to judgment as a matter of law. The Clerk is directed to enter final judgment in favor of Comcast and against WTV and close this case.

**DONE AND ORDERED** at Tampa, Florida, on June 5, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record

23